# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                                      No. CR 12-3109 JB

JESUS SALAS-AGUAYO, a.k.a. "Cuyin";
ELMY HERMOSILLO TRUJILLO, a.k.a.
"Portrillo," a.k.a. "Porto," a.k.a. "9"; CARLOS
ARTURO QUINTANA, a.k.a. "Ochenta," a.k.a.
"80"; RAUL CORELLA-HERNANDEZ, a.k.a.
"Ruso," a.k.a. "El Valle," a.k.a. "Vladimir";
JORGE ADRIAN ORTEGA-GALLEGO, a.k.a.
"Naranjas"; GUADALUPE A. PRIETO; JESUS
ISAAC RODRIGUEZ-CONTRERAS;
CLAUDIO RENE ROJO-NEVAREZ; JORGE
OLIVAS NEVAREZ, a.k.a. "Compa Chuy";
ERNESTO RODRIGUEZ; GUILLERMO
CASTILLO-RUBIO, a.k.a. "Pariente";
MARCO ANTONIO GUZMAN-ZUNIGA,
a.k.a. "Brad Pitt,"

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant Carlos Arturo Quintana's Motion

to Dismiss Based on Violations of His Constitutional Right to a Speedy Trial, filed September

19, 2023 (Doc. 377)("Motion"). The Court held a hearing on November 3, 2023 ("November

hearing). <u>See</u> Clerk's Minutes at 1, filed November 3, 2023 (Doc. 398). The primary issue is

whether the Court should dismiss the case against Quintana, because the United States violated

Quintana's right to a speedy trial under the Sixth Amendment to the Constitution of the United

States, by failing to bring Quintana to trial with reasonable diligence. The Court concludes that

the United States provides valid reasons for the delay in this case and, therefore, satisfied its

constitutional obligation to provide Quintana with a speedy trial.  Accordingly, the Court denies the Motion.

## FINDINGS OF FACT

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues.  See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record.").  The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for rule 12(d)'s purposes. The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence.  Fed. R. Evid. 104(a).  The following facts are derived from: (i) the Third Superseding Indictment, filed July 23, 2015 (Doc. 145)("Indictment"); (ii) Federal Bureau of Investigation Timeline, filed October 17, 2023 (Doc. 385)("Timeline"); (iii) Federal Bureau of Investigation Electronic Communication from Bryan Acee, filed October 17, 2023 (Doc. 385)("Acee Report"); and (iv) evidence and testimony taken at the November hearing. Notwithstanding the Court's findings, Quintana is presumed innocent.  The Court makes the following findings of fact:

**1.     The Vicente Carrillo Fuentes Organization ("VCFO").**

1.     Members of the Juarez Cartel, which is also known as the VCFO, disseminate a large quantity of marijuana from Mexico into the United States.  Indictment ¶ 1, at 1-2.  See id. at 6; Acee Report at 2-3.

2.     The VCFO, which traditionally has controlled and operated from the Mexican state of Chihuahua, is responsible for shipping multi-ton loads of marijuana throughout the United States each year.  See Indictment ¶ 4, at 3.

3.      Much of the VCFO's success is owed to its close ties with "corrupt state and local police commanders, politicians, and military leaders."  Indictment ¶ 5, at 3.

4.      The "day-to-day leader and overall manager of the VCFO" is Defendant Jesus Salas-Aguayo.  Indictment ¶ 6, at 3.

5.      Salas-Aguayo works with around a dozen "plaza bosses" who serve as "regional managers" and "report pertinent business information" back to him.  Indictment ¶ 6, at 3.

6.      The VCFO relies on Mexican farmers, the majority of whom are native "Mexican Indians" living in rural Chihuahua, to grow and harvest the marijuana that the VCFO distributes.  Indictment ¶ 8, at 5.

7.      After the marijuana is harvested, it is processed and packaged into sacks at cartel ranches, and then transported to the town of Villa Ahumada.  See Indictment ¶ 8, at 5.

8.      Marijuana loads are transported onwards from Villa Ahumada -- "usually . . . under marked police vehicle escort" -- by the VCFO's transportation team "every 10-14 days."  Indictment ¶ 9, at 5-6.

9.      These shipments travel "north to Ciudad Juarez, west to Palomas, or east to Ojinga," the three plazas that "serve as the VCFO's primary smuggling route[s] into the United States."  Indictment ¶ 9, at 6.

2.      **The Federal Bureau of Investigation's ("FBI") Investigation into the VCFO**.

10.      In October, 2010, the FBI began an investigation into a specific VCFO "cell." Draft Transcript of Hearing at 28:25-29:4 (taken October 5, 2023)(Acee)("October Tr.").[1]  See id. 27:15 (Acee); Acee Report at 1.

11.      Between February, 2011, and March, 2011, the FBI worked with two confidential human sources ("CHS") -- Oscar Carrasco-Celis, also known as CHS, October Tr. at 46:18 (Johnson)(Acee), and Juana Vasquez, also known as CW1, see October Tr. at 27:21-22 (Johnson)(Acee) -- to purchase 600 kilograms of marijuana from the VCFO, see Acee Report at 3.

12.      Between March 12, 2011, and March 16, 2011, Carrasco-Celis and Vasquez contacted Defendant Elmy Hermosillo-Trujillo to purchase a shipment of marijuana to be sold to a buyer in Albuquerque, New Mexico.  See Acee Report at 3; Timeline at 1; October Tr. at 17:11-12 (Acee).

13.      Hermosillo-Trujillo, who served as "La Oficina" or the central dispatch and communications manager for the VCFO, subsequently authorized the purchase.  Acee Report at 3. See Timeline at 1.

14.      On March 19, 2011, the purchased marijuana was delivered to the Carrasco-Celis and Vasquez.   See Acee Report at 3; Timeline at 1; October Tr. at 107:16-108:14 (Castellano)(Acee)(Johnson)(Court).

---

[1]The Court's citations to the transcripts of the hearings refer to the court reporter's original, unedited versions.  Any final transcripts may contain slightly different page and/or line numbers.

15.     The marijuana arrived in a dump truck "wrapped in enormous bundles," and Quintana and several of his men, all of whom were dressed as police officers and drove police cars, escorted the truck.  See October Tr. at 107:1-109:17 (Acee, Castellano); November Tr. at 89:12-25 (Acee, Castellano).

16.     At the time Quintana escorted the marijuana load to Gomez Farias, he served as a "plaza boss" for the region, meaning he "oversaw all operations and answered to the cartel for the hierarchy for that plaza,"  November Tr. at 76:21-24 (Acee), and was also recognized as an unsanctioned chief of police for the Namiquipa region, November Tr. at 119:21-120:20 (Johnson, Acee)("He was carrying on [] the function [] of the police driving a police car[,] pulling people over, identifying people, using a ra[d]io.").

17.     Carrasco-Celis then contacted Defendant Raul Corella-Hernandez, the head of the VCFO's transportation team, and notified him that they had a shipment of Marijuana to be transported to Albuquerque, New Mexico.  See Acee Report at 3; Timeline at 1.

18.     Corella-Hernandez collected the marijuana on March 23, 2011, and transported it to Villa Ahumada.  See Timeline at 1.

19.     That same day, Carrasco-Celis received a telephone call from Defendant Jorge Adrian Ortega-Gallegos informing him that "the cows had arrived and are safe at . . . Villa Ahumada."  Timeline at 1.

20.     On March 24, 2011, Mexican law enforcement raided a ranch in Villa Ahumada, and seized drug trafficking equipment and weapons, although they did not find any persons or marijuana.  See Timeline at 1.

21.     At approximately 5:00 p.m. on March 25, 2011, Carrasco-Celis is kidnapped at gunpoint from a residence in Chihuahua City.  See Timeline at 1.

22.     On March 26, 2011, Mexican law enforcement raided a "stash house in Ciudad Juarez," where they killed one VCFO member in a shootout, arrested four additional members, and recovered "approx. 1,500 kgs of marijuana," and other drug trafficking equipment and weapons.  Timeline at 1.

**3.      The Time Period Between the Indictment and Quintana's Arrest.**

23.     On December 5, 2012, a Grand Jury in the United States District for the District of New Mexico returned the first indictment in this case.  See Indictment at 1, filed December 5, 2012 (Doc. 2)("Indictment").

24.     Count 1 of the Indictment charges five Defendants -- Salas-Aguayo, Trujillo, Quintana, Corella-Hernandez, and Ortega-Gallegos -- with conspiracy to distribute and import one hundred kilograms or more of marijuana contrary to 21 U.S.C. §§ 959(a), 960(a)(3) and (b)(2)(G), and in violation of 21 U.S.C. § 963.  Indictment at 6.

25.     Foreign nationals residing in a foreign country wanted for violations of United States' federal law are often indicted in the United States in this fashion, because the United States wants the opportunity to arrest the target if he or she crosses into the United States without alerting the defendant that they are wanted.  Draft Transcript of Hearing, taken at 252:9-253:1 (taken November 3, 2023)(Court, Acee, Armijo)("November Tr. ").

26.     The United States issued an arrest warrant for Quintana two days after the indictment was returned on December 7, 2012.  See Arrest Warrant, filed December 7, 2012 (Doc. 5); November Tr. at 201:22-25 (Knudsen).

27.     On December 14, 2012, United States District Court for the District of New Mexico staff filed a docket entry indicating that a judge had been "randomly assigned pursuant

to AUSA request so that they may begin the extradition process."  Staff Notes, filed December 14, 2012 (no document number provided).

28.     In August, 2011, Acee prepared a target packet showing the locations, with GPS coordinates, of homes and properties associated with Quintana, including Quintana's personal residence and the address of Quintana's brother's home.  See Target Packet, admitted as Defendant's Exhibit L on November 3, 2021, November Tr. at 241:8-9 (Court); November Tr. at 212:16-214:11 (Johnson, Knudsen); id. at 252:10-17 (Acee, Armijo); id. at 214:9-11 (Knudsen).

29.     Acee provided the Target Packet to two FBI agents working out of the United States Consulate in Juarez, Mexico (the "Resolution Six agents") as part of Acee's initial efforts to have Quintana arrested.  November Tr. at 253:7-11 (Acee, Armijo).

30.     The Resolution Six agents acted as intermediaries between Acee and the Mexican government, and worked to determine whom within the Mexican government could be trusted and to gauge the Mexican governments "appetite" to arrest Quintana.  November Tr. at 253:14-255:25 (Court, Acee, Armijo).

31.     During the time between Quintana's indictment and arrest, Quintana did not attempt to conceal himself, but lived his life in an ordinary fashion and attended public events, see November Tr. at 208:14-21 (Johnson, Knudsen); See id. at 210:3-6 (Knudsen); Tr. at 208:22-209:21 (Johnson, Knudsen), but Quintana had armed men surrounding him for protection while he was in public, see November Tr. at 266:6-21 (Acee, Armijo).

32.     Following Quintana's indictment, Quintana was not Acee's primary target; rather, higher-ranking members of the VCFO were the primary targets.  See November Tr. at 267:2-5 (Acee).

33.     Between 2012 and 2018, Acee sent human sources into the region in which Quintana was known to operate to try to determine Quintana's exact location.  See November Tr. at 257:17-18 (Acee).

34.     Acee tried to ascertain what Quintana's telephone numbers were so that Quintana's location could be determined with greater specificity.  See November Tr. at 257:18-25 (Acee).

35.     Acee tried to get lower-level VCFO members who were often in Quintana's company to flip on him and "give him up to the Army."  November Tr. at 266:17-21 (Acee).

36.     Acee conducted over ninety wiretaps in coordination with other United States agencies to track Quintana's location.  See November Tr. at 259:9-260:5 (Acee, Armijo).

37.     Acee was required to route all of his efforts to apprehend Quintana through the Resolution Six agents, because FBI policy prevented its agents from engaging in direct contact with "foreign agents."  November 3  Tr. at 256:16-257:6 (Court, Acee).

38.     The United States may request that a foreign government arrest one of its nationals without a formal extradition packet or a provisional arrest request ("PAR").   See November Tr. at 260:6-22 (Court, Acee, Armijo, Johnson).

39.     It was important to have an indictment for Quintana in the United States, because the Mexican government will not communicate with the FBI about Quintana's arrest unless he had been indicted.  See November Tr. at 262:1-4 (Acee).

40.      The United States arrested and extradited multiple individuals from Mexico between 2011 and 2015, and Acee admitted that some of these individuals were defendants he helped locate.  November Tr. at 275:11-279:7 (Acee, Johnson).

41.     Acee requested that the Resolution Six agents have Quintana arrested on sixteen separate occasions.  See November Tr. at 255:16-17 (Acee); id. at 256:1-257:6 (Court, Acee).

42.     Acee made the first request shortly after Quintana was indicted.  See November Tr. at 274:9-11 (Acee).

43.     Because the United States sought so many fugitives across Mexico for which the two Resolution Six agents were tasked with coordinating arrests, Acee's role in getting someone arrested in Mexico was to "get in line" and be a "pest" by "remind[ing]" the Resolution Six agents of the target and keeping them apprised of the target's whereabouts.  November Tr. at 256:8-15 (Acee).

44.     On the occasions that Acee provided the Resolution Six agents with information regarding Quintana's whereabouts and requested Quintana's arrest, the Resolution Six agents would pass Acee's information -- including Quintana's location -- along to the Mexican army, who would then attempt to arrest Quintana.  See November Tr. at 257:25-258:5 (Acee); id. at 288:16-289:1 (Acee).

45.     The ultimate decision whether to attempt Quintana's arrest was left to the Mexican government.  See November Tr. at 255:17-19 (Acee).

46.     The Mexican army agreed to attempt to arrest Quintana only when they were already operating in the region in which Quintana was located.  See November Tr. at 276:20-23 (Acee).

47.     After Quintana's indictment, the Mexican Army made four attempts to arrest Quintana based on Acee's information, but these attempts were unsuccessful, because the Mexican army would travel in convoys that were easy for targets of arrest to see coming.  See November Tr. at 258:6-12 (Acee); id. at 276:17-18 (Acee).

48.  Acee did not document in reports any of the requests he made to have Quintana arrested nor any of the failed attempts to arrest Quintana.  See November Tr. at 282:10-22 (Acee, Johnson); id. at 277:25-278:1 (Acee); id. at 285:12-13 (Acee).

49.  During this time period, the biggest problem that Acee faced was the "Mexican's appetite" to have Quintana arrested.  November Tr. at 255:14-16 (Acee).

50.  During this time period, it was common for individuals involved in the VCFO to bribe or pay off Mexican officials to maintain their freedom.  See November Tr. 268:13-17 (Acee, Armijo).

51.  Acee believed and hoped that Quintana could become an FBI informant.   See November Tr. at 267:5 (Acee).

52.  During the time Acee sought to have Quintana arrested, Acee did not want Quintana extradited to the United States; rather, Acee wanted Quintana to be arrested in Mexico so that Acee could attempt to turn him into an informant.   See November Tr. at 275:11-12 (Acee); id. 276:7-8 (Acee); id. 277:13-16 (Acee).

53.  Acee did not try to delay Quintana's arrest.  See November Tr. at 270:17-19 (Acee, Armijo).

54.  The FBI ordinarily does not issue a PAR until it is confident that the Mexican government is ready to arrest a target, because of the risk a PAR poses to the informant who must swear to the document.  November Tr. at 258:12-16 (Acee); id. at 264:2-265:9 (Acee, Armijo).

55.  Acee was hesitant to issue an extradition request for Quintana, because the witness who ultimately swore to the request, Juana Vasquez, was married to a high-ranking

member of the VCFO who still had family in Mexico that would be endangered.  See November

Tr. at 265:10-266:5 (Acee, Armijo).

56.     In 2018, a political shift took place in Chihuahua that rendered Quintana more

"accessible" to be arrested and made Acee confident that the Mexican government would "make

a sincere effort to get" Quintana.  November Tr. at 258:19-259:5 (Acee).

57.     During the time between Quintana's indictment and arrest, Quintana was not

aware of any of the indictments and only became aware that he had been indicted when he was

arrested.  See November Tr. at 211:8-23 (Johnson, Knudsen).

**4.     The Time Period Between Quintana's Arrest and Extradition.**

58.     Mexican army special forces arrested Quintana at his home in El Terrero,

Namiquipa on May 18, 2018.  See November Tr. at 208:6-13 (Knudsen).[2]

59.     The United States requested Quintana's provisional arrest for the purpose of

extradition in Diplomatic Note Number 18-1524, which was sent to Mexico's Secretary of

Foreign Relations, Luis Videgaray Caso, on May 21, 2018.  See Diplomatic Note from Dorothy

Krebs Sarro, First Secretary, Embassy of the United States of America to Luis Videgaray Caso at

1 (dated July 23, 2018), filed September 19, 2023 (Doc. 377-1)("Extradition Request").

60.     On July 23, 2018, the United States formally requested Quintana's extradition to

the United States to stand trial.  See Extradition Request at 1.

61.     After his arrest, Quintana was incarcerated at the Federal Social Readaptation

Center No. 1 ("Altiplano Prison").  See Proof of Imprisonment at 1 (dated June 13th, 2022),

---

[2]The United States' Response indicates that the arrest occurred on May 17, 2018.  See
Response at 2.

admitted as Defendant's Exhibit M on November 3, 2021, November Tr. at 292:12-13 (Court); November Tr. at 291:7-13 (Johnson, Knudsen).

62.     After his arrest, Quintana faced charges in two criminal cases in Mexico.  <u>See</u> Proof of Imprisonment at 1; November Tr. at 291:19-25 (Johnson, Knudsen).

63.     During Quintana's incarceration at Altiplano prison, the United States continued to hope that Quintana could be turned into an informant.  <u>See</u> November Tr. at 269:7-10 (Acee).

64.     On March 19, 2019, a Mexican district court acquitted Quintana in the first case. <u>See</u> Proof of Imprisonment at 1; November Tr. at 291:21-22 (Knudsen);  <u>id.</u> at 295:10-15 (Armijo, Knudsen).

65.     On March 5, 2021, a Mexican district court entered an order of non-prosecution in the second case, and ordered Quintana's "immediate release."  Proof of Imprisonment at 1.  <u>See</u> November Tr. at 291:23-25 (Knudsen); <u>id.</u> at 292:14-18 ("It says that he was ready for immediate release as of March 5, 2021."); <u>id.</u> at 295:10-15  (Armijo, Knudsen).

66.     After the Mexican cases against Quintana had concluded, the United States worked to get Quintana to the United States more quickly.   <u>See</u> November Tr. at 268:25-269:4 (Acee).

67.     At some point during the time Quintana was incarcerated at Altiplano prison, the United States attempted to travel to the prison to speak with Quintana about becoming an informant, because Quintana's counsel at the time asked the United States to interview Quintana and indicated that Quintana "wanted to cooperate."  November Tr. at 344:20-345:5 (Armijo). <u>See</u> <u>id.</u> at 270:3-8 (Acee); <u>id.</u> at 276:10-11 (Acee).

68.     As of June 13, 2022, Quintana was in custody at Altiplano Prison "at the request of the Ministry of Foreign Affairs," because the United States' request for extradition had been granted.[3]  Proof of Imprisonment at 1.

69.     The United States did not attempt to delay Quintana's extradition in any way.  See November Tr. at 268:20-270:19 (Acee, Armijo).

70.     The Mexican government had the authority to determine when Quintana could be extradited.  See November Tr. at 279:16-18 (Acee); id. at  268:20-24 (Acee, Armijo).

71.     The United States traveled to Mexico to pick Quintana up and from Mexico when the Mexican government said the United States "could have him." November Tr.  279:16-18 (Acee).

72.     On August 18, 2022, Quintana was extradited to the United States.  See Motion at 1; Response at 2.

## PROCEDURAL BACKGROUND

The FBI's 2011 investigation into the VCFO cell resulted in this case.  On December 5, 2012, a Grand Jury returned the first indictment.  See Indictment at 1.  The United States issued an arrest warrant for Quintana two days later on December 7, 2012.  See Arrest Warrant, filed December 7, 2012 (Doc. 5); November Tr. at 201:22-25 (Knudsen).  On July 24, 2014, a Grand Jury returned the second indictment in this case, which superseded the initial indictment.  See Redacted Superseding Indictment at 1, filed July 24, 2014 (Doc. 9).  On June 16, 2015, a Grand Jury returned the third indictment in this case, which superseded the initial two indictments.  See Redacted Second Superseding Indictment at 1, filed June 17, 2015 (Doc. 64).  On July 23, 2015,

---

[3]The record does not establish the date that Mexico granted the United States' request for Quintana's extradition.

a Grand Jury returned the Indictment, which superseded the three initial indictments.   See Indictment at 1.   Additional arrest warrants were issued shortly after each superseding indictment. See Arrest Warrant, filed July 25, 2014 (Doc. 14); Arrest Warrant, filed June 17, 2015 (Doc. 71); Arrest Warrant, filed July 23, 2015 (Doc. 152).   Count 1 of the Indictment charges five Defendants -- Salas-Aguayo, Trujillo, Quintana, Corella-Hernandez, and Ortega-Gallegos -- with conspiracy to distribute and import one hundred kilograms or more of marijuana contrary to 21 U.S.C. §§ 959(a), 960(a)(3) and (b)(2)(G), and in violation of 21 U.S.C. § 963. See Indictment at 6.

      1.      **The Motion to Dismiss.**

Quintana filed the Motion on September 19, 2023.   See Motion at 1.   In the Motion, Quintana moves the Court "to dismiss his case with prejudice based on a violation of his Sixth Amendment right to a speedy trial."   Motion at 1.   Quintana contends that "[n]early 11 years have elapsed" since he was first accused of his crime and that, "for six of those years, the government sat on the indictment before seeking Mr. Quintana's extradition."   Motion at 1-2. Accordingly, Quintana argues, the four factors that the Supreme Court outlined in Barker v. Wingo, 407 U.S. 514 (1972)("Barker")(the "Barker factors"), weigh in his favor and dismissal is warranted.   See Motion at 3 (citing Barker, 407 U.S. at 515).

First, Quintana argues that the preliminary Barker factor, concerning the length of delay, weighs in his favor, because the nearly six-year delay between Quintana's indictment and the United States' request for his extradition is "'presumptively prejudicial.'"   Motion at 4 (quoting United States v. Heshelman, 521 Fed. Appx. 501, 505, (6th Cir. 2013)).   This presumption, Quintana provides, triggers the "balancing analysis" under the second through fourth Barker factors.   Motion at 4.   Second, Quintana contends that the second Barker factor weighs in his

favor, because the United States has not supplied an "'acceptable rationale' for the delay." Motion at 4-5 (quoting United States v. Seltzer, 595 F.3d 1170, 1177 (10th Cir. 2010)).   "In cases involving indicted defendants in foreign countries," Quintana argues, "the court must first determine whether the defendant was aware of the charges as well as the government's efforts to locate the defendant."  Motion at 5 (citing United States v. Mendoza, 530 F.3d 758, 763 (9th Cir. 2008)).  After clarifying that "failure to seek extradition is delay attributable to the government," Motion at 6 (citing United States v. McDonald, 172 F. Supp. 2d 941, 946 (W.D. Mich. 2001)(Enslen, J.), Quintana argues that the reason for delay is attributable to the United States, because federal agents knew where Quintana was located since 2011, see Motion at 6.  Quintana further contends that, despite knowing where Quintana "could be found," the United States "did not attempt to notify Mr. Quintana of the charge pending against him nor did the government seek Mr. Quintana's extradition."  Motion at 6.  Quintana contends that, in addition to the delay between the indictment and the request for extradition, the United States cannot justify the fifty-one-month delay from Quintana's arrest to his ultimate extradition, nor the more recent thirteen-month delay that has elapsed since his extradition.  Motion at 6-7.

Quintana argues that the third Barker factor weighs in his favor, because Quintana has asserted his right to a speedy trial both "when he appeared before the Court for arraignment," and "when he filed and argued his notice of appeal of detention order."  Motion at 7-8.  Quintana further provides that he also has "raised concerns over trial delays" related to the United States' failure to turn over relevant evidence on more recent occasions.  Motion at 8.  As to the fourth Barker factor, Quintana argues that the six-year delay in seeking his extradition has been prejudicial to his defense, because the delay has resulted in lost opportunities to interview "alibi witnesses" who were aware Quintana was not in Gomez Farias on the day he allegedly escorted

the marijuana delivery to Gomez Farias.  Motion at 9.  In addition, Quintana avers, the delay has resulted in his inability to secure exculpatory evidence from the files of the two individuals arrested at the stash house in Ciudad Juarez.  See Motion at 9.  Quintana argues further that, even absent these demonstrated impairments, he "is not required to prove prejudice because the six-year delay from indictment to extradition gives rise to a presumption of prejudice."  Motion at 9.

      **2.**      **The Response.**

The United States responds to Quintana's Motion.  See Response at 1.  The United States begins by describing its efforts to locate Quintana after the initial indictment.  See Response at 1. The United States argues that "the FBI worked with Mexican intelligence agencies and law enforcement in an effort to get [Quintana] arrested as soon as the arrest warrants were issued in this case."  Response at 1.  The United States provides that the Mexican government launched several unsuccessful "operations in the area that they believed the Defendant was residing" and explains that it "is not uncommon as in the past" for it to take "numerous operations to successfully arrest high-level cartel members."  Response at 1.  The United States describes that another effort to locate Quintana by "develop[ing] numerous informants" also proved unsuccessful, because "the FBI was in need of vetting a Mexican arrest team to physically arrest the Defendant."  Response at 1-2.  The United States provides: "The FBI worked throughout the years with other United States law enforcement agencies and Mexican authorities to track [Quintana] down before he was successfully captured."  Response at 2.  Finally, the United States provides an overview of the instances in which Quintana moved to continue his trial.  See Response at 2-3.

Turning to the Barker factors, the United States begins by conceding that the length of delay between Quintana's indictment and arrest is sufficient to trigger the Court's inquiry into

the remaining <u>Barker</u> factors.  <u>See</u> Response at 5.  The United States argues, however, that the remaining three <u>Barker</u> factors do not weigh heavily against it.  <u>See</u> Response at 5.  First, the United States contends that there was good reason for the delay between Quintana's indictment and his arrest, because "the United States took active steps to bring Defendant into custody," and "the reason that Defendant was not arrested shortly after his indictment is because he was in Mexico."  Response at 5.  While the United States concedes that "it might be argued the government was negligent" in attempting to locate Quintana, the United States avers that it did not "act[] in bad faith" or "with the intent to delay Defendant's trial in order to hamper his defense."  Response at 6 ("The United States . . . challenges even the assertion that it was 'negligent. . . .'" (no citation given for quotation)).  Even if the Court concludes that the United States acted negligently in its attempts to bring Quintana into custody, the United States argues, "such a finding would not militate that this factor weigh heavily against the United States much less favor the defendant."  Response at 6 (quoting <u>United States v. Bagga</u>, 782 F.2d 1541, 1544 (11th Cir. 1986)).

The third <u>Barker</u> factor, the United States contends, also "remains neutral," because Quintana did not assert his right to a speedy trial when he states he had asserted it.  Response at 7 (citing Motion at 7-8).  The United States points to Quintana's numerous requests for trial continuances as evidence that he did not assert properly his right to a speedy trial and asserts that Quintana's reliance on <u>United States v. Seltzer</u>, 593 F.3d 1170, 1179 (10th Cir. 2010), is unavailing, because the defendant in that case explicitly asserted his right to a speedy trial.  <u>See</u> Response at 7.  Turning to the last <u>Barker</u> factor, the United States argues that, "[b]ecause the first three factors do not weigh heavily against the United States, the Defendant must show actual prejudice."  Response at 7 (citing <u>United States v. Knowles</u>, 390 Fed. App'x 915, 929 (11th Cir.

2010)).   The United States proceeds that Quintana has not demonstrated actual prejudice, because his arguments regarding the loss of opportunities to interview alibi witnesses are speculative and because Quintana has not established the additional evidence which he contends he has been prevented from securing contain exculpatory evidence.  See Response at 7.

    **3.**    **The Hearing.**

At the November 3 hearing, Quintana began by calling Paula Sanchez Knudsen, a private investigator who "conducted investigative work about . . . Mr. Quintana's whereabouts between 2012 and 2018," to the stand.  November Tr. at 201:10-15 (Johnson, Knudsen).  Knudsen asserted that "she found no documentation of an extradition packet from the U.S. Government to the Mexican Government" from 2012 until 2018, when Knudsen identified a diplomatic note from the United States Embassy in Mexico to the Mexican government sent in May, 2018, requesting Quintana's provisional arrest.  November Tr. at  205:9-208:5 (Johnson, Knudsen).  Knudsen stated that she had determined that Quintana was arrested at his home in El Terrero, Namiquipa, in May, 2018.  See November Tr. at 208:6-13 (Knudsen).

Knudsen next described the information that she had gathered about Quintana's whereabouts and activities between 2012 and 2018.   See November Tr. at 209:14-211:23 (Johnson, Knudsen).  Knudsen indicated that, based on her investigation, Quintana was not aware of the 2012 indictment and only became aware that he had been indicted when he was arrested.  See November Tr. at 211:8-23 (Johnson, Knudsen).  Knudsen provided that Quintana was living his life in an ordinary fashion, and "was out and about in the community."  November Tr. at 208:14-21 (Johnson, Knudsen).  See id. at 210:3-6 (stating that witnesses told Knudsen that they "would see him outside of his residence, see him at the apple orchards, they would see him at mass, go to the store").   As an example, Knudsen described photographs that she

reviewed in which Quintana appeared to be at a public celebration and a hotel resort.  See November Tr. at 208:22-209:21 (Johnson, Knudsen).

Knudsen further explained that her investigation indicated that, in 2011, "the FBI and the United States Government was aware of where Mr. Quintana was located."  November Tr. at 212:8-14 (Johnson, Knudsen).  Knudsen provided that she located an August, 2011, FBI "target packet" that shows the locations, with GPS coordinates, of homes and properties associated with Quintana, including the address of Quintana's brother's home.  November Tr. at 212:16-214:11 (Johnson, Knudsen).  According to Knudsen, this information was submitted to the Mexican Government.  See November Tr. at 214:9-11 (Knudsen).  Turning to the allegations about the March 19, 2011, delivery of marijuana -- wherein the United States alleges that Quintana escorted the load of purchased marijuana to Gomez Farias -- Knudsen explained that she learned Quintana was attending a celebration in the town of Colonia Independencia on March 19, 2011.  See November Tr. at 214:20-216:6 (Johnson, Knudsen).  Knudsen stated that witnesses with which she spoke said Quintana was in attendance and spoke to numerous people.  See November Tr. at 216:7-18 (Johnson, Knudsen).  Finally, Knudsen explained that it is "fair to say that much of the irrefutable evidence . . . for the celebration of March 19 in Colonia Independencia [is] no longer available" because of "the passage of time." November Tr. at 219:17-220:1 (Johnson, Knudsen).  See id. at 219:7-10 (Knudsen)("[T]here would have been photos.  And again, they have not been able to be located due to the passage of time and it being on older phones that people don't know where they are at this point."); id. at 217:6-10 (Knudsen)("The [church] records are not available at this time.  A lot of times they were handwritten back then.  So locating records from so long ago would be difficult."); id. at 217:17-23 (Knudsen)(explaining that a bishop with which Quintana interacted at the celebration died in 2021).

The United States cross-examined Knudsen.  See November Tr. at 220:5-9 (Court, Armijo, Knudsen).  Knudsen clarified that she generally is aware that the United States "need[s] the cooperation of Mexican authorities" to effect an arrest in Mexico and that there have been times during which the Mexican government has not been cooperative regarding arresting individuals at the United States' request.  November Tr. at 220:24-222:3 (Armijo, Knudsen). Knudsen explained that she did not have the photographs about which she testified, see November Tr. at 222:4-12 (Armijo, Knudsen), and that she learned when the photographs were taken, and gathered information about what was shown in the photographs, from two witnesses: Dulce Denise Carol and Anastio Pando, see November Tr. at 223:1-22 (Armijo, Knudsen). Knudsen stated that one of the witnesses had been in a romantic relationship with Quintana, whereas the other witness was Quintana's friend.  See November Tr. at 231:7-9 (Armijo, Knudsen).

Quintana objected that the information which the United States seeks from Knudsen about the two witnesses -- Carol and Pando -- is part of Quintana's investigation and, therefore, the attorney work product doctrine protects it.  See November Tr. at 235:9-236:2 (Court, Armijo, Johnson).  The Court responded that how Carol and Pando were contacted is relevant, and Quintana agreed that the attorney work product doctrine does not protect the mere fact that Quintana's counsel directed her investigators to contact the witnesses.  See November Tr. at 236:3-237:16 (Court, Johnson).  Knudsen explained that she had not come across any songs written about Quintana nor encountered a 2017 newspaper article about Quintana,[4] but

---

[4]Quintana objected that the article was "completely false," but the Court allowed the question and indicated that the United States was "simply asking[,] did Ms. Knudsen see the article."  Tr. at 229:10-19 (Court, Johnson).

acknowledged that she had heard that high-level cartel officials were sometimes not arrested because Mexican government officials protected them.  See November Tr. at 226:6-229:20 (Court, Armijo, Johnson, Knudsen).

On redirect, Knudsen explained what the satellite images in the target packet show, including that the images depict aerial views of Quintana's primary residence and his secondary residence, and the Court admitted the target packet into evidence.  See November Tr. at 238:16-241:9 (Court, Armijo, Johnson, Knudsen).  Knudsen indicated that she worked to corroborate the information which she received from Carol and Pando by conducting additional research, and did not recognize any potential bias in the witness who was romantically involved with Quintana.  See November Tr. at 243:20-246:7 (Johnson, Knudsen).  In response to the Court's request for clarification, Knudsen and Quintana provided that the United States made a "provisional arrest request" in May, 2018 -- after which Quintana was arrested -- and then sent the Mexican government an "official extradition packet in July of 2018" to "provide information on Mr. Quintana."  November Tr. at 246:8-247:21 (Court, Johnson, Knudsen).  Quintana then agreed with the Court that an individual is not arrested until the country in which the individual is located agrees to extradite the individual, but provided that "the person does not need to be arrested for the US Government to submit an extradition request."  November Tr. at 247:22-249:11 (Court, Johnson).   The United States indicated that they disagreed with Quintana's "theory of how he was arrested, and why he was[] arrested." November Tr. at 250:16-20 (Armijo).

The United States called Acee to the stand.  See November Tr. at 250:11-251:7 (Court, Acee, Armijo).  The United States explained that the initial warrant for Quintana's arrest came from the United States District Court for the District of New Mexico.  See November Tr. at

252:4-8 (Court, Armijo).  Warrants like the one here often came from a United States court even where the target of the warrant is in Mexico, Acee continued, because the United States wants the opportunity to arrest the target if he or she crosses into the United States without "advertis[ing]" to the target "that they're wanted right away."  November Tr. at 252:9-253:1 (Court, Acee, Armijo).  Acee next explained the steps that he took after Quintana's indictment to secure Quintana's arrest in Mexico, which was initiated, Acee stated, by his providing the Target Packet to the Resolution Six agents.  See November Tr. at 253:7-254:17 (Court, Acee, Armijo).  Acee explained that the Resolution Six agents' role is to act as intermediary between Acee and the Mexican government, and to assist in securing Quintana's arrest.  See November Tr. at 254:21:255:25 (Acee).  The Resolution Six agents, Acee provided, worked "to figure out who is on what side, who can we trust with this operation;" worked to determine what the "Mexican[s'] appetite to get this guy" is; and worked to "try[] to please the agents on this side of the border with the requests," while trying to keep informants, upon whose information warrants for the arrest of targets in Mexico were based, from being discovered and killed.  See November Tr. at 254:21:255:25 (Acee).  Acee described that he and the Resolution Six agents had to take care not to "make our intelligence so singular that the opposition figures out how we got to them," which would result in the informant being "burn[ed]."  November Tr. at 255:5-21 (Acee)(explaining that Acee has had four informants "kidnapped and murdered," because of "hiccups" in allowing targets to determine who provided information to the entities seeking their arrest).

Acee continued that he made sixteen requests to the Resolution Six agents to have Quintana arrested.  See November Tr. at 255:16-17 (Acee); id. at 256:1-257:6 (Court, Acee).  Acee stated that the "biggest problem" was the "Mexican's appetite" to have Quintana arrested, November Tr. at 255:14-16 (Acee), so he would provide updates on Quintana's location to the

Resolution Six agents and ask them whether Quintana could be arrested, but that it was ultimately up to the Mexican government whether to proceed with Quintana's arrest, <u>see</u> November Tr. at 255:17-19 (Acee).[5]  Because FBI policy prevented agents from direct contact with "foreign agents," Acee explained, he was required to route all of his efforts to apprehend Quintana through the Resolution Six agents.   November Tr. at 256:16-257:6 (Court, Acee).  Acee clarified that, because the United States sought so many fugitives across Mexico for which the two Resolution Six agents were tasked with coordinating arrests, Acee's role in getting someone arrested in Mexico was to "get in line" and be a "pest" by "remind[ing]" the Resolution Six agents of the target and keeping them apprised of the target's whereabouts.  November Tr. at 256:8-15 (Acee).

Acee described that, from 2012 to 2018, he primarily did two things: First, he sent human sources into Quintana's "area to figure out where he is."  November Tr. at 257:17-18 (Acee).  Second, Acee tried to ascertain what Quintana's telephone numbers were so that Quintana's location could be determined with greater specificity, and passing this information along to the Resolution Six agents with requests for Quintana's arrest.  <u>See</u> November Tr. at 257:18-25 (Acee).  Acee explained that, when he provided the Resolution Six agents with information about Quintana's location, the agents would reach out to the Mexican Army, who would then attempt

---

[5]Specifically, Acee stated:

[W]e put the target packets together.  We give them to our FBI agents in Mexico, and say:  We have a warrant for the guy.  Here he is.  What is the Mexican[s'] appetite to get this guy?  That's the biggest problem.  With this defendant I asked 16 different times.  Can we go?  Here he is.  Here's an update.  Can we go?  And it's up to the Mexicans to say yes.

November Tr. at 255:12-19 (Acee).

to arrest Quintana.   See November Tr. at 257:25-258:5 (Acee).   Acee stated that these "operations were a failure and unsuccessful" largely because the Mexican Army would travel "in convoys instead of helicopters, so these guys see them from miles away," when attempting an arrest.  November Tr. at 258:6-12 (Acee).

"It wasn't until the Government of . . . Mexico was ready to get rid of [Quintana,] because politics changed in Chihuahua, with the arrest of the governor down there," Acee explained, that Quintana became "accessible."   November Tr. at 258:12-16 (Acee).   Acee continued that, when this political change occurred in 2018, the FBI felt comfortable providing the Mexican government with a PAR[6] which the FBI does not do until it is confident that the Mexican government is ready to arrest a target, because of the risk a PAR poses to the informant who must swear to the document.   November Tr. at 258:12-16 (Acee).   The FBI uses this procedure because most PARs that the DEA or FBI sent to the Mexican government, Acee explained, are "done after the Mexicans capture the person[, o]r there was an agreement beforehand that the Mexicans will make a sincere effort to get them," neither of which the FBI had in the case of the PAR concerning Quintana before 2018.  November Tr. at 258:19-259:5 (Acee).[7]   Acee also described that he worked with other United States agencies to conduct "over

---

[6]During the hearing, the parties occasionally referred to a provisional arrest request as a provisional arrest warrant, or "PAW."   See, e.g., November Tr. at 258:12-259:5 (Acee).

[7]Specifically, Acee stated:

It wasn't until the Government of the Mexico was ready to get rid of him because politics changed in Chihuahua, with the arrest of the governor down there, that he was accessible now.   Politics changed, and now the Government of Mexico is saying:  We can get this guy.  Oh, great, we have warrant, let's get him. And we need a PAW.  We don't do the PAWs until the Mexicans are going to grab somebody, because it burns a witness.  We have to have a witness swear it out.

90 wiretaps in Mexico City to track this defendant and the other indicted parties and the other leaders of the Juarez Cartel," but acknowledged that he probably shouldn't have relied on these other "three[-]letter agencies," because "[t]hey don't like to come to court."  November Tr. at 259:9-260:5 (Acee, Armijo).

Acee stated that the United States did not need "an extradition packet to ask another country if they'll arrest someone."  November Tr. at 260:6-22 (Court, Acee, Armijo, Johnson). In response to the Court's question, Quintana clarified that a provisional arrest warrant requests a provisional arrest via a diplomatic note and notifies the foreign government that a formal extradition request is forthcoming.  See November Tr. at 260:23-261:21 (Court, Armijo, Johnson).  While Quintana acknowledged that an extradition request could come either before or after the provisional arrest request, he clarified that a provisional arrest warrant could not lead to an extradition without more and is, therefore, "contingent on sending the extradition request." November Tr. at 262:2-263:5 (Court, Johnson).  Acee indicated that he agreed "for the most part" with Quintana's description of a provisional arrest warrant, and added that the provisional arrest warrant enables the United States to assure the Mexican government that the United States is "not going to execute their citizens when they come here."  November Tr. at 263:9-25 (Acee).

In addition, Acee explained that the United States can request extradition after the Mexican government arrests someone, and that the United States ordinarily waits for this arrest

---

And if we put a witness in a provisional arrest warrant, they get killed.  So we don't do the provisional arrest warrants until the Mexicans are serious about catching him.  If you look at the PAWs that the DEA or the FBI do, most of them are done after the Mexicans capture the person.  Or there was an agreement beforehand that the Mexicans will make a sincere effort to get them.  We didn't have that in this case.

November Tr. at 258:12-259:5 (Acee).

to happen before requesting an extradition, because of the risk that an extradition request poses to the witness who identifies the target in the request.   See November Tr. at 264:2-265:9 (Acee, Armijo).   In this case, Acee agreed that there was "hesitancy" on his part to issue the extradition request, because the witness who ultimately swore to the request, Juana Vasquez, was married to a high-ranking member of the VCFO who still had family in Mexico who would be endangered. See November Tr. at 265:10-266:5 (Acee, Armijo).   Acee noted that, while he was attempting to arrest Quintana, Quintana always had armed men surrounding him for protection while he was in public.   See November Tr. at 266:6-21 (Acee, Armijo).   Acee explained that Quintana remained in Mexico from his arrest in 2018 to his arrival in the United States in 2022, because Quintana "had charges in Mexico in a couple cases."   November Tr. at 268:18-24 (Acee, Armijo).   During that time, Acee described that he and the United States worked to turn Quintana into an informant for the United States, but that he in no way attempted to delay Quintana's arrest.   See November Tr. at 268:25-270:19 (Acee, Armijo); id. at 269:7-10 (Acee)("I wanted to flip him.   I wanted him to work.   I wanted him to talk to me, like the other guys did.   I wasn't trying to send him to prison.   I was trying to get him on Team America."); id. at 269:3-4 (Acee)(explaining that Acee "fought" "[b]oth to get [Quintana] here and to get me down there to talk to him).

Quintana cross-examined Acee.   See November Tr. at 271:1-2 (Johnson).   Acee explained that he did not have an extradition request during the sixteen times he made a request for Quintana's arrest to the Resolution Six agents.   See November Tr. at 274:4-8 (Acee, Johnson).   Acee explained that he did not want Quintana extradited, because he wanted Quintana to be arrested in Mexico so that Acee could attempt to turn him into an informant.   See November Tr. at 275:11-12 (Acee); id. 276:7-8 (Acee); id. 277:13-16 (Acee).

Johnson:     But no extradition request; right?

Acee:     "I don't want him here.  I want him there.  I want him to work."

. . . .

Johnson:     But yet you still don't make a provisional arrest request; right?

Acee:     No, because I don't want him arrested and prosecuted here.

. . . .

Johnson:     But you still did not submit a provisional arrest request via diplomatic note?

Acee:     No, because that would get him -- for the reasons I've already explained, no, that wasn't my intent.  It wasn't an oversight.  I didn't want that.

November Tr. at 275:11-277:16 (Acee, Johnson).  Acee acknowledged that, around 2014-2015 and before 2018, "there were people arrested in Chihuahua who were part of the cartel, or wanted by the US."  November Tr. at 275:11-279:7 (Acee, Johnson).

Quintana indicated that he had been acquitted of charges in Mexico on March 5, 2021. See November Tr. at 279:19-20 (Johnson).  Acee acknowledged that Quintana was not extradited until August 18, 2022, and indicated that August 18, 2022, was "when they said we could have him," November Tr. at 281:6-9 (Acee, Johnson), and that he includes in a February 1, 2013, report that FBI agents had been "meeting regularly with their counterparts in Mexico City to coordinate VCFO operations and investigative leads," November Tr. at 281:16-282:9 (Acee, Johnson).  Acee indicated that he did not include in any reports the unsuccessful attempts to arrest Quintana or to convince the Mexican government to attempt to arrest Quintana, because he typically would report only.  See November Tr. at 284:7-14 (Acee); id. at 285:12-13 (Acee)("I write the things that are actioned and actually happen.").  Acee acknowledged that he received the information about Quintana's protection while he was in public from informants and that he

had not seen Quintana until Quintana was extradited.   See November Tr. at 286:1-13 (Acee, Johnson).

Quintana recalled Knudsen to the stand.   See November Tr. at 290:9-10 (Johnson). Knudsen clarified that Quintana was ready to be released from custody in Mexico on March 5, 2021.   See November Tr. at 292:14-18 (Johnson, Knudsen).   Knudsen also described that photographs which Knudsen viewed of Quintana being taken into custody in 2018 show no uniformed police officers other than the members of the Mexican army who arrested Quintana. See November Tr. at 293:8-17 (Johnson, Knudsen).  The United States cross-examined Knudsen. See November Tr. at 293:24-294:5 (Court, Armijo).  Knudsen agreed that at least some of the images and documents which she has reviewed of Quintana's arrest did not show or discuss an "active arrest," but shows and discusses police officers processing evidence and taking measurements.  November Tr. at 306:19-312:3 (Armijo, Knudsen).  Knudsen indicated that the images do not show that there was a shoot-out when Quintana was taken into custody, despite that there was something that "looks like a bullet hole" in one of the images.   November Tr. 312:4-14 (Court, Armijo, Johnson, Knudsen).   See id. at 308:15-17 (Armijo, Knudsen). Nevertheless, Knudsen described that two of the images she has reviewed show "federales" at Quintana's residence at the time of his arrest, although Knudsen agreed that she cannot confirm the exact time at which the photographs were taken.  November Tr. at 314:6-315:23 (Armijo, Knudsen).  During a brief redirect, Knudsen agreed that she saw no evidence in the photographs that Quintana resisted his arrest.  See November Tr. at 317:8-10 (Johnson, Knudsen).

Quintana explained that the case law makes clear that the United States has to be "diligent" in seeking the extradition of someone in a foreign country who is wanted by the United States.  November Tr. at  321:20-322:4 (Johnson).  Quintana argued that the United

States' concern about its witnesses or the fact that Acee wanted to turn Quintana into an informant does not excuse the requirement that the United States seek extradition expeditiously. November Tr. at  322:4-7 (Johnson).  Further, Quintana contended, the Mexican government "would not have been able to arrest Mr. Quintana without at a minimum the provisional request via diplomatic note," and, once the Mexican government received the provisional arrest request in 2018, Quintana was "arrested immediately."  November Tr. at 322:25-323:9 (Johnson).

The Court indicated that it understood that Acee described that Quintana was arrested in 2018, because it was at that time that the political situation in Chihuahua changed.  See November Tr. at 323:10-15 (Court).  Quintana responded that Acee's testimony on this point is inconsistent, because Acee acknowledged that the FBI managed to secure other individuals' arrest between 2012 and 2018.  See November Tr. at 323:16-24 (Johnson).  Quintana argued "that Acee admitted on the stand[, "]well, I didn't want him [arrested." H]e admitted that . . . he didn't want him arrested . . . ."  November Tr. at 325:18-21 (Johnson).  While Quintana acknowledged that the third Barker factor, whether Quintana asserted his right to a speedy trial, is likely "neutral," Quintana acknowledged the remaining factors weigh heavily against the United States.  November Tr. at 328:22-329:5 (Johnson).  Specifically, Quintana contended that the loss of key alibi evidence demonstrates prejudice, and, moreover, prejudice should be presumed because of the length of delay.  See November Tr. at 325:24-328:22 (Court, Johnson).

In response to the Court's request that the United States "explain the reasons for the delay" between the indictment and Quintana's arrest, the United States argued that the delay was attributable to: (i) Quintana's "position in the cartel," which means that he was protected from arrest or tipped off whenever the Mexican Army attempted to arrest him; and (ii) the risk proceeding with Quintana's arrest and extradition posed to witnesses.  November Tr. at 340:5-

341:6 (Court, Armijo).  The Court expressed concern that it "heard sworn testimony today that the government agent that's in charge did not want him arrested."  November Tr. at 346:21-23 (Court).  The United States averred that Acee's comments, in which he expressed that he did not want Quintana arrested, was not harmful to the United States' argument that it attempted diligently to bring Quintana to trial, because Acee's statements were "taken out of context." November Tr. at 343:15-25 (Court, Armijo).  Rather, the United States provided that Acee wanted Quintana to cooperate "at one point in time," but otherwise "wanted him to be picked up and brought in and face these charges," and worked expeditiously toward that result.  November Tr. at 344:5-345:2 (Armijo).  Despite that Acee testified that he made requests to the Resolution Six agents to have Quintana arrested, the Court expressed concern that there was nothing on the record demonstrating the Resolution Six thereafter "ask[ed] anybody to arrest him."  November Tr. at 349:2-11 (Court).  The United States responded that the communication between the Resolution Six agents and the Mexican government could be inferred from the fact that Acee testified that the Resolution Six agents responded to Acee's requests regarding whether Quintana's arrest was feasible or whether the Mexican Government was working in a particular area.  See November Tr. at 349:2-22 (Court, Armijo).  See id. at 354:2-5 (Armijo).

    **4.**    **The Supplement to the Motion.**

Quintana filed a supplemental memorandum to support the Motion. See Defendant Carlos Arturo Quintana's Supplemental Memorandum in Support of Defendant's Motion to Dismiss for Violation of Mr. Quintana's Sixth Amendment Right to a Speedy Trial, filed November 17, 2023 (Doc. 392)("Supp. Motion").  In the Supp. Motion, Quintana refutes the primary arguments that the United States provides to justify the delay between the indictment and Quintana's arrest. Supp. Motion at 1-6.  First, in response to the United States' arguments that it worked diligently

to secure Quintana's arrest, Quintana contends that the United States has not produced any evidence of the Mexican military's "attempts, between 2012 and 2018, to arrest Mr. Quintana." Supp. Motion at 2.  Even if the United States had requested the Mexican government arrest Quintana, Quintana argues, "Mexican authorities could not have made the arrest with simply a U.S. arrest warrant."  Supp Motion at 3. Moreover, Quintana provides, the United States "was aware of Mr. Quintana's exact whereabouts in Mexico" "since August of 2011," but Quintana was not arrested until 2018.  Supp. Motion at 2.  During this time, Quintana argues, he "was not hiding" and "was going about his daily life activities."  Supp. Motion at 4.

In addition, Quintana contends that the fact that the United States' "concede[s] there were indeed several cartel[-]connected people arrested in Chihuahua during this timeframe," refutes the United States' argument that "corruption by the governor of the state of Chihuahua . . . was an impediment to arresting anyone in Chihuahua."  Supp. Motion at 2-3.  Moreover, Quintana provides, the United States "intentionally delayed Mr. Quintana's arrest because they 'did not want him here.'"  Supp. Motion at 3 (quoting November Tr. at 276:7-8 (Acee)).  Rather, Quintana argues, the United States "intentionally delayed seeking Mr. Quintana's arrest and intentionally did not seek a provisional arrest warrant so the Mexican government could arrest him," because it wanted to gather additional evidence against Quintana and wanted to turn Quintana into an informant for the United States.  See Supp. Motion at 3.  See id. at 17 ("The government was also unable to demonstrate that anyone from the United States government actually reached out to the Mexican authorities to arrest Mr. Quintana prior to May 2018.").  Only when the United States' efforts to turn Quintana into an informant failed, Quintana provides, did the United States finally request Quintana's arrest, at which point he was "peacefully" taken into custody.  Supp. Motion at 5.

According to Quintana, these facts amount to a violation of his Sixth Amendment right to a speedy trial, because the blame for the lengthy delay in bringing Quintana to trial is attributable to the United States.  See Supp. Motion at 6.  Because the United States' delay was "deliberate and intentional," Quintana argues, dismissal of Quintana's case should be "virtually automatic."  Supp. Motion at 7.  Quintana concedes that courts have excused the United States' failure to seek a defendant's extradition where "seeking extradition would be futile," but "substantial evidence" must support this futility, which the United States has not provided.  Supp. Motion at 12-13.  Quintana counters the United States' contention that an extradition request would have been futile by citing evidence of extraditions from Mexico to the United States during the period between Quintana's indictment and extradition.  See Supp. Motion at 13-16.  Specifically, Quintana describes that Acee "assisted the Mexican Military in locating and arresting" at least one "top leader of the Juarez Cartel" from 2011 to 2015.  Supp. Motion at 16.  Although Quintana does not identify any specific instances in which he asserted his right to a speedy trial, see Supp. Motion at 19, he argues that the prejudice factor has been established, because of the loss of key alibi evidence and because "prejudice is presumptive because [there has been] a delay of slightly over 82 months," Supp. Motion at 19-21.

**5.      The Supplement to the Response.**

The United States filed a supplemental memorandum to support the Response.  See United States' Supplemental Response to Defendant Carlos Arturo Quintana's Motion to Dismiss Based on Violations of His Constitutional Right to a Speedy Trial, filed November 17, 2023 (Doc. 391)("Supp. Response").  The United States argues that it "did not unreasonably or deliberately delay a trial in the instant case," because the United States "made reasonable efforts to locate and prosecute the defendant."  Supp. Response at 4.  Specifically, the United States

contends, the delay "was largely due to the climate in Mexico."  Supp. Response at 4.  Quintana "did not assert his right to a speedy trial" nor has he demonstrated sufficient prejudice to his case because of the delay, the United States provides.  Supp. Response at 5-6.  Accordingly, the primary Barker factor of import, the United States asserts, is the reason for delay.  See Supp. Response at 6.

The United States describes in detail Acee's efforts "to have the defendant arrested and brought to the United States to face trial and the barriers that accompanied those efforts."  Supp. Response at 6-9.  Quintana was not arrested until 2018, the United States argues, because it was not until that time that "the political climate in Mexico changed [and] Chihuahua 'became ripe for intervention again,'" Response at 10 (quoting November Tr. at 267:21-22 (Acee)), and "before that time, [provisional arrest] warrants risked burning the witness who would be listed in the warrant," Response at 10 (quoting November Tr. at 259-60; id. at 265-67).  The United States concedes that, in his "heart of hearts," Acee did not want Quintana's arrest, because he "wanted another cooperator from the Juarez Cartel."  Response at 10.  See id. at 9 ("Agent Acee made a couple of passing references to the fact that he didn't want the defendant arrested . . . .").  At the same time, the United States argues, Acee "continued to work diligently to secure the defendant's arrest and extradition."  Response at 10.  See id. at 10 ("Agent Acee noted that '[w]e just kept pushing the ball down the field. Like, here's another attempt, here's another attempt.'" (quoting November Tr. at 282:19-22 (Acee)).[8]

---

[8]The Court has reviewed the United States' submission pursuant to the Classified Information Procedures Act, 18 U.S.C. app. 3 ("CIPA"), for the purposes of resolving this Motion.  See Government's Notice of Classified Filing at 1, filed November 20, 2023 (Doc. 394).

## LAW REGARDING THE SIXTH AMENDMENT
## RIGHT TO A SPEEDY TRIAL

The Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial."  U.S. Const. amend. VI.  "The right to a speedy trial 'attaches when the defendant is arrested or indicted, whichever comes first,'" United States v. Muhtorov, 20 F.4th 558, 634 (10th Cir. 2021)("Muhtorov")(quoting United States v. Medina, 918 F.3d 774, 779 (10th Cir. 2019)), cert. denied, 143 S. Ct. 246 (2022), and "detaches upon conviction," Betterman v. Montana, 578 U.S. 437, 441 (2016).  Under the Speedy Trial clause, "[b]oth the prosecutor and the court have an affirmative constitutional obligation to timely try a defendant."  United States v. Garcia, 59 F.4th 1059, 1065 (10th Cir. 2023), cert. denied, No. 22-7528, 2023 WL 6378133 (U.S. October 2, 2023).  The Speedy Trial clause "[r]eflect[s] the concern that a presumptively innocent person should not languish under an unresolved charge." Betterman v. Montana, 578 U.S. at 443.  "[A]lthough the right is somewhat amorphous, the remedy is severe: dismissal of the indictment."  United States v. Seltzer, 595 F.3d 1170, 1175 (10th Cir. 2010).

In Barker, 407 U.S. 514 (1972), the Supreme Court of the United States identifies four factors that guide the Court's analysis: (i) the length of delay; (ii) the reason for the delay; (iii) the defendant's assertion of his right; and (iv) prejudice to the defendant.  See 407 U.S. at 530. No one factor is "necessary or sufficient to conclude a violation has occurred. Instead, the factors are related and must be considered together along with other relevant circumstances."  United States v. Toombs, 574 F.3d 1262, 1274 (10th Cir. 2009).

### 1.    The First Barker Factor: The Length of the Delay.

The first Barker factor, "is actually a double enquiry."  Doggett v. United States, 505

U.S. 647, 652 (1992)("Doggett").  First, "[t]he length-of-delay factor . . . serves as a gatekeeper." United States v. Garcia, 59 F.4th at 1065.  See Barker, 407 U.S. at 530 ("The length of the delay[,] is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.").  In Doggett, the Supreme Court identified that, depending on the case's circumstances, delay "approach[ing] one year" is presumptively prejudicial, thereby triggering the Barker balancing test. 505 U.S. at 652 n.1.  See United States v. Batie, 433 F.3d 1287, 1290 (10th Cir. 2006)("Delays approaching one year generally satisfy the requirement of presumptive prejudice."); Barker, 407 U.S. at 531 ("[T]he delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge.").  Second, if the defendant establishes presumptive prejudice, the court must then determine the weight to assign the first factor:  "The greater the delay, the more that factor favors the defendant."  United States v. Hicks, 779 F.3d 1163, 1168 (10th Cir. 2015).

**2.  The Second Barker Factor: The Reason for the Delay.**

The second Barker factor, the reason for the delay, "is especially important."  United States v. Garcia, 59 F.4th at 1065.  See United States v. Margheim, 770 F.3d 1312, 1326 (10th Cir. 2014)("The second Barker factor -- the reason for delay -- is '[t]he flag all litigants seek to capture.'" (quoting United States v. Loud Hawk, 474 U.S. 302, 315 (1986))).  The prosecution has the burden to "explain the cause of the pretrial delay."  United States v. Garcia, 59 F.4th at 1065.  See Jackson v. Ray, 390 F.3d 1254, 1261 (10th Cir. 2004)("The Supreme Court places the burden on the state to provide an inculpable explanation for delays in speedy trial claims.").  In the Tenth Circuit, analysis of the second Barker factor is conducted in two steps: courts first "quantify[] and then weigh[] the delay."  Muhtorov, 20 F.4th at 639.

"In the first part of the inquiry we attempt to 'divide' the overall delay into discrete 'periods during which an indictment was pending against' the defendant to provide manageable units of analysis [and] determine whether each period should weigh for or against a constitutional violation." Muhtorov, 20 F.4th at 639-40 (quoting United States v. Black, 830 F.3d 1099, 1113 (10th Cir. 2016)). "[F]or each discrete period, the question is 'whether the government or the criminal defendant is more to blame for [the] delay.'" Muhtorov, 20 F.4th at 640 (quoting Doggett, 505 U.S. at 651). The Court determines "whether each period should weigh for or against a constitutional violation," Muhtorov, 20 F.4th at 639-40, and evaluates whether the United States, "has carried its burden 'to provide an acceptable rationale for the delay.'" Muhtorov, 20 F.4th at 643 (quoting United States v. Seltzer, 595 F.3d at 1113). A period of delay is excused where the United States presents a "valid reason," Barker, 407 U.S. at 531, such as where the United States diligently works to bring the defendant to trial, see Doggett, 505 U.S. at 656 ("[I]f the Government had pursued Doggett with reasonable diligence from his indictment to his arrest, his speedy trial claim would fail.").

"To satisfy the requirement of reasonable diligence, the government does not need to make 'heroic efforts' to pursue a suspect . . . , but it must at least make a 'serious effort.'" United States v. Velazquez, 749 F.3d 161, 180 (3d Cir. 2014)(quoting Rayborn v. Scully, 858 F.2d 84, 90 (2d Cir. 1988), then Doggett, 505 U.S. at 652). Despite that a formal extradition is an important method by which the United States may demonstrate its diligence in pursuing a foreign defendant, a failure to seek extradition does not preclude a finding that the United States acted with reasonable diligence. See In re Kashamu, 769 F.3d 490, 494 (7th Cir. 2014)(Posner, J.)("We're not at all sure that the government ever must try to extradite a fugitive so as to protect his right to a speedy trial."). Furthermore, where the United States "has a good faith belief

supported by substantial evidence that seeking extradition from a foreign country would be futile, due diligence does not require our government to do so."  United States v. Corona-Verbera, 509 F.3d at 1114.  See United States v. Blanco, 861 F.2d 773, 778 (2d Cir.1988)("Due diligence does not require the government to pursue goals that are futile.").  Conversely, the United States Court of Appeals for the Eighth Circuit has held that the fact that officials in the foreign country have the discretion to deny the request for extradition under the treaty does not in itself mean that the request would be futile.  See United States v. Pomeroy, 822 F.2d 718, 721-22 (8th Cir. 1987).

At the second step of the reason-for-delay inquiry, courts in the Tenth Circuit "'determin[e] how heavily the delay weighs' in the overall constitutional analysis."  Muhtorov, 20 F.4th at 640 (quoting United States v. Gould, 672 F.3d 930, 937 (10th Cir. 2012)).   The Supreme Court has provided that different levels of United States' culpability in the delay result in the assignment of greater or lesser weight to the second Barker factor:

> A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government.[] A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

Barker, 407 U.S. at 531.  See United States v. Garcia, 59 F.4th at 1065-66.  "Purposeful delay or delay to gain advantage weighs heavily against the government . . . ."  United States v. Gould, 672 F.3d at 937.  "[A] more 'neutral' explanation such as negligence, while weighted 'less heavily,' will nevertheless weigh against the government, and a 'valid reason' will 'justify [an] appropriate delay.'"  United States v. Cone, 310 F. App'x 212, 216-17 (10th Cir. 2008)(quoting

Barker, 407 U.S. at 531).[9]

### 3.      The Third Barker Factor: Assertion of the Right.

"The defendant's assertion of his speedy trial right . . . is entitled to strong evidentiary weight in determining whether [he] is being deprived of the right." Barker, 407 U.S. at 531-32. Conversely, "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." Barker, 407 U.S. at 532. The defendant has the "burden of showing he desired a speedy trial." United States v. Gould, 672 F.3d at 938. The Tenth Circuit has "said that the ultimate inquiry is 'whether the defendant's behavior during the course of litigation evinces a desire to go to trial with dispatch.'" Muhtorov, 20 F.4th at 650 (quoting United States v. Batie, 433 F.3d at 1291). In making this determination, courts "weigh the frequency and force of his objections to the delay." Muhtorov, 20 F.4th at 650 (quoting United States v. Margheim, 770 F.3d at 1328). "A defendant's early and persistent assertion of his right to a speedy trial will tip the third factor in his favor, but efforts to stall the proceedings, such as 'moving for many

---

[9]United States v. Cone is an unpublished opinion, but the Court can rely on a United States Court of Appeals for the Tenth Circuit unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. [. . .] However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citing In re Citation of Unpublished Opinions/Ords. & Judgments, 151 F.R.D. 470 (10th Cir. 1993)). The Court concludes that United States v. Cone, as well as United States v. Frater, 495 F. App'x 878 (10th Cir. 2012), and United States v. Vaughan, 643 F. App'x 726 (10th Cir. 2016); have persuasive value with respect to material issues in this case, and will assist the Court in its preparation of this Memorandum Opinion and Order.

continuances,' will 'tip the balance of this factor heavily against the defendant.'" United States v. Medina, 918 F.3d at 781 (quoting United States v. Margheim, 770 F.3d at 1328).

### 4.    The Fourth Barker Factor: Prejudice.

The fourth Barker factor considers "prejudice to the defendant" resulting from the delay. Barker, 407 U.S. at 530.  The defendant "has the burden of showing prejudice." United States v. Toombs, 574 F.3d at 1275.  Despite that no single Barker factor "is a necessary or sufficient condition to the finding of the deprivation of the right of speedy trial[,] the lack of prejudice is nearly fatal to a claim." United States v. Nixon, 919 F.3d 1265, 1278 (10th Cir. 2019).  "A defendant can establish prejudice by two different means: (1) a presumption of prejudice,[10] or (2) specific evidence of prejudice." Muhtorov, 20 F.4th at 653.

First, "[i]n cases of 'extreme' delay, the defendant need not present specific evidence of prejudice, but can rely on a 'presumption of prejudice' resulting from the prolonged delay." United States v. Medina, 918 F.3d at 781 (citing United States v. Frater, 495 F. App'x 878, 882 (10th Cir. 2012)).  "Generally, the court requires a delay of six years before allowing the delay itself to constitute prejudice." United States v. Seltzer, 595 F.3d at 1180 n.3.  See Jackson v. Ray, 390 F.3d at 1264 ("[B]ecause the delay is less than six years, clearly established Supreme Court law does not require application of the *Doggett* rule.").[11]  The Tenth Circuit has clarified

---

[10]"Both the first and fourth Barker factors involve 'presumptive prejudice,' but the analysis differs between the two." United States v. Muhtorov, 20 F.4th at 653 n.81.

[11]The Tenth Circuit has explained that the rule that delays greater than six years are presumptively prejudicial stems from the Supreme Court's decision in United States v. Doggett, 505 U.S. 647 (1992):

In *Doggett*, the Court held that a delay of eight and one-half years, of which the government was responsible for approximately six years, relieved the

that, "for purposes of establishing presumptive prejudice, '[courts] should consider only the delay attributable to the government, and not the delay attributable to the defendant.'" Muhtorov, 20 F.4th at 653 (quoting United States v. Hicks, 779 F.3d at 1168-69).

Second, absent an extreme delay, "the defendant must provide specific evidence of how the delay was prejudicial." United States v. Medina, 918 F.3d at 781. Prejudice is evaluated by considering the interests that the right to a speedy trial protects: (i) preventing oppressive pretrial incarceration; (ii) minimizing the accused's anxiety and concern; and (iii) limiting the possibility of the defense's impairment. See Baker v. Wingo, 407 U.S. at 532. "After impairment to the defense, the 'second most important [prejudice] factor' is oppressive pretrial incarceration '[b]ecause the seriousness of a post-accusation delay worsens when the wait is accompanied by pretrial incarceration.'" Muhtorov, 20 F.4th at 654 (quoting Jackson v. Ray, 390 F.3d at 1264). To show prejudice through anxiety and concern, a defendant must demonstrate "special harm suffered which distinguishes his case from that of any other arrestee awaiting trial." United States v. Dirden, 38 F.3d 1131, 1138 (10th Cir. 1994). "[G]eneralized and conclusory references to the anxiety and distress that purportedly are intrinsic to incarceration," however, "are not sufficient to demonstrate particularized prejudice." United States v. Larson, 627 F.3d 1198, 1210-11 (10th Cir. 2010).

"Impairment of the defense is the most important interest." Jackson v. Ray, 390 F.3d at

---

defendant of the need to make a particularized showing of prejudice. Id. at 657, 112 S.Ct. 2686. The Court held that "[w]hen the Government's negligence thus causes delay six times as long as that generally sufficient to trigger judicial review [i.e., six years], and when the presumption of prejudice, albeit unspecified, is neither extenuated as by the defendant's acquiescence, nor persuasively rebutted, the defendant is entitled to relief." Id. at 658, 112 S.Ct. 2686.

Jackson v. Ray, 390 F.3d at 1263-64.

1264.  See United States v. Garcia, 59 F.4th at 1069 ("The third interest -- impairing the defense -- is the most serious 'because the inability of a defendant to adequately prepare his case skews the fairness of the entire system.'" (quoting United States v. Seltzer, 595 F.3d at 1179-80)).  To establish that the defense was impaired, the defendant must "show definite and not speculative prejudice, and in what specific manner missing witnesses would have aided the defense."  United States v. Margheim, 770 F.3d at 1331 ("We have looked with disfavor on defendants' hazy descriptions of prejudice.").  See Jackson v. Ray, 390 F.3d at 1265 ("In arguing that the unavailability of a witness impaired the defense, a defendant must state with particularity what exculpatory testimony would have been offered.").  Impairment to the defense may result from lost witnesses -- including witnesses whose memory has faded because of the passage of time -- and lost evidence.  See Muhtorov, 20 F.4th at 654 (citing Barker, 407 U.S. at 532).  In evaluating whether the loss of evidence during a delay amounts to prejudice, the Tenth Circuit has considered: "(1) the defendant's ability to demonstrate with specificity how the evidence would have aided his defense; (2) whether the government's delay in bringing the defendant to trial caused the evidence to be actually lost; and (3) whether the defendant took appropriate steps to preserve the evidence."  United States v. Medina, 918 F.3d at 781-82.

## ANALYSIS

Quintana argues that the eleven years that have transpired since he was first indicted warrant the dismissal of this case with prejudice.  See Motion at 1.  The United States responds that it has made diligent efforts to bring Quintana expeditiously to trial and that it is not at fault for the delay.  See Response at 1.  Applying the Barker factors, the Court concludes that: (i) the first Barker factor -- the length of the delay -- weighs in favor of a constitutional violation; (ii) the second factor -- reason for the delay -- weighs against a constitutional violation; (iii) the third

factor -- the defendant's assertion of the speedy trial right -- weighs against a constitutional

violation; and (iv) the fourth Barker factor -- weighs in favor of a constitutional violation, though

not heavily.  After balancing all four Barker factors, the Court concludes that Quintana's Sixth

Amendment right to a speedy trial has not been violated.

## I.   THE LENGTH OF DELAY IS BOTH SUFFICIENT TO TRIGGER THE COURT'S INQUIRY INTO THE REMAINING BARKER FACTORS AND WEIGHS IN FAVOR OF A CONSTITUTIONAL VIOATION.

The consideration of the first Barker factor is a "double enquiry."  Doggett, 505 U.S. at

651.  First, courts consider whether the length of delay is greater than one year; if the delay is

greater than one year, the inquiry into the remaining three Barker factors is triggered.  See

Doggett, 505 U.S. at 652 n.1; Barker, 407 U.S. at 530.  Second, the court determines the weight

to assign the first factor.  See United States v. Hicks, 779 F.3d at 1168.  The length of delay is

the time between the attachment of the Sixth Amendment right, which occurs at the earlier of

indictment or arrest, and the end of trial.  See Betterman v. Montana, 578 U.S. at 443.  The

United States acknowledges that the length of delay in this case "is sufficient to trigger the

Court's inquiry into the remaining three *Barker* factors."  Response at 5.  The Court agrees that

the Court's inquiry into the remaining Barker factors is triggered, because the eleven years that

have elapsed since Quintana was indicted surpasses the one-year threshold necessary to trigger

the Court's inquiry.[12]  See Doggett, 505 U.S. at 652 n.1.

---

[12]The United States concedes that the Court's consideration of the remaining Barker factors is triggered by "the length of delay between the time Defendant was indicted and his arrest in Mexico."  Response at 5.  See Supp. Response at 4 ("Approximately five years and five months past between the defendant's initial indictment and his arrest in Mexico.").  While the result is the same, the proper measure of the length of delay for purposes of analyzing the first Barker factor is not between indictment and arrest, but between indictment and conviction.  See Betterman v. Montana, 578 U.S. 437, 441 (2016)(holding that the Sixth Amendment right to a

The Court next considers "the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." Doggett, 505 U.S. at 652. "The greater the delay, the more that factor favors the defendant." United States v. Hicks, 779 F.3d at 1168. The eleven-year delay in this case stretches a great deal beyond the one-year minimum required to trigger the Court's analysis. See United States v. Hicks, 779 F.3d at 1168 ("[T]he parties agree that the delay was five and a half years. Thus, this factor favors Hicks."). Moreover, the argument that this case may be considered complex is of little help to the United States. See Barker, 407 U.S. at 531 ("[T]he delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge."). The Tenth Circuit has held that a six-and-a-half-year delay, which the eleven-year delay in this case nearly doubles, "strongly favors" the defendant even where the case was "'complex' for purposes of the first Barker factor." United States, 20 F.4th at 639. See United States v. Velazquez, 749 F.3d at 185-86 (five-year delay in bringing the defendant to trial in a drug conspiracy case was

---

speedy trial "when a defendant is arrested or formally accused" and "detaches upon conviction")(citing United States v. Marion, 404 U.S. 307, 320-21 (1971))); United States v. Doggett, 505 U.S. 647, 651-52 (1992)(measuring the length of delay as the "interval between accusation and trial"); Barker v. Wingo, 407 U.S. 514, 520 (1972)(discussing the "delay between arrest and punishment"). Where a primary purpose of the right to a speedy trial is "to prevent oppressive pretrial incarceration," the only logical conclusion is that the speedy trial clock continues to tick post-arrest up until the resolution of trial. Barker v. Wingo, 407 U.S. at 532. Were the rule otherwise, the United States would avoid the Sixth Amendment's strictures where it indicts a defendant, takes the defendant into custody shortly thereafter, and then delays for years the defendant's trial while the defendant languishes in incarceration.

As discussed in Part II, infra at 46-66, the Court's assessment of the United States' reasons for delay necessitates parsing the overall delay into distinct periods of time -- one period of which includes the length between indictment and arrest -- to attribute fault more specifically between the parties. See United States v. Muhtorov, 20 F.4th at 639. Such segmentation is not necessary, however, at this initial stage of the analysis, because "it is not appropriate to inquire into the reasons for the delay when deciding whether the delay was long enough to trigger the balancing test." United States v. Reumayr, 530 F. Supp. 2d 1200, 1202 n.1 (D.N.M. 2007)(Black, J.).

"extraordinary").  In sum, because the delay "was uncommonly long," and "the presumption that pretrial delay has prejudiced the accused intensifies over time," the first Barker factor weighs in Quintana's favor.  Doggett, 505 U.S. at 651-52.

## II.    THE REASON FOR DELAY FACTOR DOES NOT WEIGH IN FAVOR OF A CONSTITUTIONAL VIOLATION.

The resolution of the second Barker factor, the "flag all litigants seek to capture," is of crucial importance to the speedy trial analysis.  United States v. Loud Hawk, 474 U.S. at 315. To determine whether the second Barker factor, the reason for delay, supports a finding of a constitutional violation, the Court "quantif[ies] and then weigh[s] the delay."  Muhtorov, 20 F.4th at 639.  The Court quantifies the delay by analyzing the four distinct periods during which the indictment was pending against Quintana, and determines "whether each period should weigh for or against a constitutional violation," Muhtorov, 20 F.4th at 639-40: (i) the period between Quintana's indictment and his arrest in Mexico; (ii) the period between Quintana's arrest and the culmination of the Mexican proceedings against Quintana; (iii) the period between the culmination of the Mexican proceedings against Quintana and Quintana's extradition; and (iv) the period between Quintana's extradition and trial.  For each discrete period, the Court asks, "whether the government or the criminal defendant is more to blame for that delay."  Doggett, 505 U.S. at 651.  Second, the Court "'determine[es] how heavily each delay weighs' in the overall constitutional analysis," Muhtorov, 20 F.4th at 640 (quoting United States v. Gould, 672 F.3d at 937), a process that requires the Court to ultimately "assess the cause of the delay," Muhtorov, 20 F.4th at 640 (quoting United States v. Black, 830 F.3d at 1120).

In quantifying the periods of delay, the Court concludes that no period of delay weighs in favor of a constitutional violation.  Specifically, for the first three periods of delay leading up to

Quintana's extradition, the Court concludes that the United States justifies the delays by demonstrating that it acted with "reasonable diligence" to bring Quintana to trial.  Doggett, 505 U.S. at 656.  For the final period of delay between Quintana's extradition and trial, the Court concludes that the delay does not weigh in favor of a constitutional violation, because both the United States and Quintana are responsible for equal periods of delay during this timeframe. Accordingly, after weighing "the entire pretrial period as a whole" at the second step of the reason-for-delay analysis, Muhtorov, 20 F.4th at 643, the Court concludes that the second Barker factor weighs against a constitutional violation.

A.     IN QUANTIFYING THE DELAY, THE COURT CONCLUDES THAT NO PERIOD OF DELAY WEIGHS IN FAVOR OF A CONSTITUTIONAL VIOLATION.

"The first step of the second Barker factor analysis entails dividing the pretrial period into smaller 'periods during which an indictment was pending.'" Muhtorov, 20 F.4th at 643 (quoting United States v. Black, 830 F.3d at 1113).  The Court determines "whether each period should weigh for or against a constitutional violation," Muhtorov, 20 F.4th at 639-40, and evaluates whether the United States, "has carried its burden 'to provide an acceptable rationale for the delay.'"  Muhtorov, 20 F.4th at 643 (quoting United States v. Seltzer, 595 F.3d at 1113).  The Court is mindful that the United States has an affirmative obligation to locate and bring a defendant to trial in a timely manner.  See Muhtorov, 20 F.4th at 639; United States v. Blanco, 861 F.2d at 778 ("[T]he government has a constitutional duty to make a diligent, good faith effort to bring a defendant to trial promptly.").  A period of delay is excused where the United States presents a "valid reason," Barker, 407 U.S. at 531, such as where the United States diligently works to bring the defendant to trial, see Doggett, 505 U.S. at 656 ("[I]f the Government had pursued Doggett with reasonable diligence from his indictment to his arrest, his

speedy trial claim would fail."). The Court concludes that: (i) the sixty-five-and-a-half-month delay between Quintana's indictment and his arrest in Mexico does not weigh in favor of a constitutional violation, because the United States has demonstrated that it diligently sought Quintana's arrest; (ii) the thirty-three-and-a-half-month delay between Quintana's arrest and the culmination of the Mexican proceedings against Quintana does not weigh in favor of a constitutional violation, because the delay was caused by the Mexican proceedings against Mexico, and the United States satisfied its burden to seek Quintana's extradition; (iii) the seventeen-and-a-half-month delay between the culmination of the Mexican proceedings against Quintana and Quintana's extradition does not weigh in favor of a constitutional violation, because the United States has established that it diligently sought Quintana's extradition; and (iv) the sixteen-month delay between Quintana's extradition and trial does not weigh in favor of a constitutional violation, because both the United States and Quintana are responsible for equal periods of delay during this timeframe.

1. **The Period of Delay Between Quintana's Indictment and Arrest Does Not Weigh in Favor of a Constitutional Violation, Because the United States Acted with Reasonable Diligence.**

The delay between Quintana's indictment on December 12, 2012, and arrest on May 18, 2018, spanned sixty-five-and-a-half months. In the context of a prearrest delay, the Court assesses whether the United States "pursued [Quintana] with reasonable diligence from his indictment to his arrest." Doggett, 505 U.S. at 656. This means that the United States must make a "serious effort" to locate and apprehend a defendant if it is to discharge its constitutional obligation. Doggett, 505 U.S. at 652-53. See United States v. Mendoza, 530 F.3d 758, 763 (9th Cir. 2008)("[I]f the defendant is not attempting to avoid detection and the government makes no serious effort to find him, the government is considered negligent in its pursuit."). A court's

analysis of due diligence should be conducted "on a case by case basis taking into account the totality of the circumstances." United States v. Walton, 814 F.2d at 280. See Rayborn v. Scully, 858 F.2d 84, 90 (2d Cir. 1988)("[T]he precise amount of effort that is required, to demonstrate diligence, however, is apt to vary depending on the circumstances of the case.").

The United States' obligation to act diligently remains "even when the defendant is located in a foreign country." United States v. Heshelman, 521 F. App'x at 507. See Doggett, 505 U.S. at 656. "When the United States has a valid extradition treaty in place with a foreign country and prosecutors formally seek extradition pursuant to that treaty, courts routinely hold that the government has satisfied its diligence obligation." United States v. Fernandes, 618 F. Supp. at 62. Despite that a formal extradition is an important method by which the United States may demonstrate its diligence, however, a failure to seek extradition does not preclude a finding that the United States acted with reasonable diligence. In re Kashamu, 769 F.3d 490, 494 (7th Cir. 2014)(Posner, J.)("We're not at all sure that the government ever must try to extradite a fugitive so as to protect his right to a speedy trial."). In addition, where the United States "has a good faith belief supported by substantial evidence that seeking extradition from a foreign country would be futile, due diligence does not require our government to do so." United States v. Corona-Verbera, 509 F.3d at 1114.

The United States justifies the delay in bringing Quintana to trial by arguing that it diligently pursued Quintana's arrest and "took numerous affirmative steps to ascertain the Defendant's whereabouts and bring him back to the United States following his indictment." Response at 6. See Supp. Response at 6-9. In addition, the United States contends that requesting Quintana's request would have been futile because before 2018 the political conditions in Chihuahua were not favorable to securing Quintana's arrest and extradition. See

Supp. Response at 10.   Quintana argues that the United States did not act with reasonable

diligence, because the United States did not "seek Mr. Quintana's extradition" despite that the

United States "knew the exact location . . . where he could be found," Motion at 6, and disputes

that a request for extradition would have been futile, see Supp. Motion at 2-3.   While the Court

does not credit the United States argument that its requesting extradition would have been

futile,[13] the Court concludes that the United States pursued Quintana's arrest with reasonable

---

[13]In the Supp. Response, the United States argues for the first time that it did not pursue
Quintana's extradition, because doing so would have been futile.   See Supp. Response at 10 ("It
is evident from the evidence presented at the November 3 hearing that extradition was futile until
the political climate in Mexico changed in 2018.").   "[W]here our government has a good faith
belief supported by substantial evidence that seeking extradition from a foreign country would be
futile, due diligence does not require our government to do so."   United States v. Corona-
Verbera, 509 F.3d 1114.   Because the United States' has provided only sparce evidence that
Quintana's extradition would have been futile, the Court concludes that the delay between
Quintana's indictment and arrest cannot be excused on the basis that requesting extradition
would have been futile.
    The only evidence that the United States' offers in support of its claim that a request for
Quintana's extradition between 2012 and 2018 would have been futile are Acee's statements that
a political shift occurred in Chihuahua in 2018 that made it possible to arrest Quintana.   See
FOFs, ¶ 54, at 10.   Acee's claims that testimony on these points "does not approach the
definitive, multi-source evidence other courts have found sufficient to excuse a failure to request
extradition."   United States v. Fernandes, 618 F. Supp. 2d at 60.   For example, the United States
has not come forth with the type of evidence the Ninth Circuit adjudged to be "substantial" in
United States v. Corona-Verbera, 509 F.3d at 1105, where the United States "backed" an FBI
agent's testimony with a U.S. State Department report, statistical evidence, and additional expert
testimony supporting the United States' argument that requesting extradition from Mexico on
drug charges would have been futile.   509 F.3d at 1114-15.   Instead, the scant evidence in
support of futility offered here more closely resembles the evidence of a "single conversation"
with Indian officials "about the possibility of extradition," and how the process "might take
several years," that was found to be insufficient in United States v. Fernandes, 618 F. Supp. 2d at
69-70.
    Moreover, an extradition treaty exists between the United States and Mexico, United
States v. Heshelman, 521 F. App'x at 508 ("[A]ctively seeking Heshelman's extradition would
not have been futile because the United States has an extradition treaty with Switzerland that
covers all the charges at issue."), and the United States has offered no evidence that the Mexican
government "had a policy of denying extradition requests involving its citizens," United States v.
Blanco, 861 F.2d at 778; United States v. El Naddaf, No. CR 13-10289, 2023 WL 2541555, at

diligence, thereby discharging its constitutional duty to provide Quintana with a speedy trial during this period of delay.

The record demonstrates that Acee "actively attempt[ed] to bring [Quintana] to trial," United States v. Mendoza, 530 F.3d 758, 763 (9th Cir. 2008), by "exercise[ing] sufficient diligence in attempting to locate and apprehend [Quintana] during this period," Rayborn v. Scully, 858 F.2d at 90. Acee pursued Quintana's arrest by seeking to ascertain Quintana's location through the use of wiretaps, confidential informants, and by tracking Quintana's cellular phone. See FOF ¶¶ 33-34, 36, at 7-8. In United States v. Blanco, the United States "met its duty of due diligence" in similar fashion "by having its agent, Charles Cecil, investigate Blanco's whereabouts and attempt to keep track of her through an informant." United States v. Blanco, 861 F.2d at 778. Acee requested that the Resolution Six agents have Quintana arrested on sixteen separate occasions, four requests of which resulted in the Mexican army making unsuccessful attempts to bring Quintana into custody. See FOF ¶ 41, at 8; United States v. Vasquez-Uribe, 426 F. App'x at 138 (concluding that the United States acted diligently where it "assiduously collaborated with foreign and multinational law enforcement agencies in its efforts

---

*19 (D. Mass. Mar. 16, 2023)(Woodlock, J.)("More is required of the government to demonstrate its reasonable diligence in this circumstance than its assertion that extradition would likely be futile where, as here, the defendant was, by all accounts, unaware that he had been indicted."). To the contrary, the United States extradited multiple individuals, including members of the VCFO, from Mexico between 2011 and 2015, and Acee admitted that some of these individuals were defendants he helped locate. See FOF ¶ 40, at 8. This undermines Acee's claim that Chihuahua was "shut off" and did not become "ripe for intervention again" until 2018. November 3 Tr. at 267:21-22 (Acee). In sum, the United States has not come forth with substantial evidence that requesting Quintana's extradition would have been futile. Nevertheless, because a failure to seek extradition, even one that is not futile, is not fatal to its claim of reasonable diligence, see In re Kashamu, 769 F.3d at 494, it is ultimately of little import that the United States has not shown that a request for extradition would have been futile in this case.

to locate Vasquez-Uribe").   Acee was a "pest" who constantly provided updates to the Resolution Six agents regarding Quintana's location and availability for arrest.   FOF ¶ 43, at 8 (quoting November Tr. at 256:8-15 (Acee)).   These actions constitute serious efforts to apprehend Quintana and, ultimately, to bring him to trial.

Indeed, Acee's actions during the five-and-a-half-year delay constitute far greater effort than the actions the United States took in United States v. Corona-Verbera, which the Ninth Circuit found sufficient to demonstrate diligence.  See 509 F.3d at 1115.  In United States v. Corona-Verbera, the United States merely entered the defendant's "name into the National Crime Information Center ("NCIC") computer system" and contacted the television shows "Unsolved Mysteries and America's Most Wanted," which aired television programs about the defendant's case.  509 F.3d at 1115.  Nevertheless, the Ninth Circuit determined that "[t]hese actions constitute diligence on the part of the government."  509 F.3d at 1115.  Acee's efforts to ascertain Quintana's location and coordinate with the appropriate Mexican officials through the Resolution Six agents to have Quintana arrested constitute far greater diligence than entering Quintana's name into a computer system and requesting a television show run a segment about him.  See United States v. Heshelman, 521 F. App'x at 507 ("[R]easonable diligence has been found where the government seeks the assistance of foreign governments and uses the tools available to find and extradite the defendant."); United States v. Hayes, 40 F.3d 362, 366 (11th Cir. 1994)(concluding that the United States acted with reasonable diligence when it made numerous "efforts to have the United Kingdom intercede on behalf of the United States," and made "inquiries to the Zimbabwean Embassy concerning Thom's whereabouts).  Cf. United States v. Fernandes, 618 F. Supp. 2d at 70 ("The government has failed to satisfy its diligence obligation[, because it] took only two affirmative steps in attempting to secure defendant's

return: entering defendant's name into two government databases and initiating a "ruse" with a SSA special agent.").  The Court concludes, therefore, that the United States persistent efforts to locate Quintana and coordinate with Mexican officials to have Quintana arrested meet that burden.

Quintana argues that the United States cannot have acted with reasonable diligence during this period, because it did not seek Quintana's extradition.  See Motion at 1-2, 6-7.  The Court disagrees with the premise of this argument, however, because it concludes that: (i) the United States may act with reasonable diligence even where it does not seek extradition; and (ii) the United States has provided valid reasons for not pursuing Quintana's extradition before he was taken into custody.  To be sure, the United States did not file its extradition request until July 23, 2018,  see FOF ¶ 60, at 11, and the Court finds that Acee did not want Quintana extradited during the time he sought to locate and apprehend Quintana, but rather wished him to be arrested in Mexico, so that Quintana might serve as a confidential informant for the FBI, see FOF ¶ 52, at 10.  These facts do not negate, however, that the United States satisfied its constitutional obligation by working diligently to bring Quintana to trial by pursuing his arrest.  In In re Kashamu, the Honorable Richard A. Posner, United States Circuit Judge for the United States Court of Appeals for the Seventh Circuit, acknowledged that "[s]ome cases have suggested that the government has a duty to seek extradition of a fugitive, if feasible, if it wants to insulate its prosecution of the fugitive . . . from a speedy-trial defense."  769 F.3d at 494.  See, e.g., United States v. Eguez, No. 2:09-CR-92, 2016 WL 6493456, at *7 (M.D. Fla. November 2, 2016)(Steele, J.)("As a general matter, the United States has an obligation to seek extradition of a fugitive defendant . . . .").  Judge Posner disagreed with these district courts, however, and concluded that he was "not at all sure that the government ever must try to extradite a fugitive so

as to protect his right to a speedy trial." In re Kashamu, 769 F.3d 494.[14]  See United States v.

Valencia-Quintana, 136 F. App'x at 709 (finding reasonable diligence even though "the

government did not formally request extradition," but instead "procure[d] an agreement from

Dominican officials to notify the DEA prior to Valencia's release . . . from Dominican custody").

Even in United States v. Fernandes, which Quintana cites favorably for its claim that "'the

hallmark of diligence is extradition,'" Supp. Motion (citing 618 F. Supp. 2d at 69),[15] the

Honorable Douglas P. Woodlock, United States District Judge for the United States District

Court for the District of Columbia, acknowledges that extradition may not be required for the

United States to satisfy its constitutional obligation.  See 618 F. Supp. 2d at 70 ("The

government has failed to satisfy its diligence obligation even if extradition is not required."

---

[14]Judge Posner arrived at this conclusion, in part, by recognizing that "the government has to make sure that the fugitive is aware that he's been indicted or otherwise charged in the United States."  In re Kashamu, 769 F.3d 494.  At least one district court has relied on this language to conclude that the United States did not act with reasonable diligence in part because "it made no attempts to inform a defendant of the indictment against him."  United States v. El Naddaf, No. CR 13-10289-2, 2023 WL 2541555 (D. Mass. March 16, 2023)(Woodlock, J.).  United States v. El Naddaf recognized, however, that the United States should not be required to take affirmative steps to put a defendant on notice of their indictment when there are "countervailing considerations, such as a continuing investigation that would be compromised by premature disclosure of outstanding charges."  2023 WL 2541555, at *20.  Attempts to notify a defendant of charges often would cause a defendant to flee, conceal himself, or persuade family or friends to harbor them.  The Court does not agree with Judge Posner that there is a duty to notify a defendant at all before arrest; an arrest, or diligent efforts to effect an arrest serves as required notice.  Moreover, here, the United States' investigation into the VCFO is a "countervailing consideration" that would have been "compromised by premature disclosure of outstanding charges" against Quintana.  2023 WL 2541555, at *20.  Given Quintana's relationship with law enforcement in Mexico, and the corruption that existed in the Chihuahuan government, he may well have known that the United States sought to arrest him.  See FOF ¶¶ 3, 50, at 3, 9.

[15]In the Supp. Motion, Quintana attributes this quotation to the Supreme Court in Doggett, 505 U.S. 647.  The assertion does not appear in Doggett, however, but was made in United States v. Fernandes, 618 F.Supp. 2d at 69.

(emphasis added)).

Moreover, the conclusion that seeking extradition is not required to demonstrate diligence where the United States diligently pursues the defendant's arrest makes logical sense, because the defendant's apprehension is also a necessary prerequisite to providing the defendant a speedy trial.  When an indicted defendant is located abroad, extradition will at some point become important, because a foreign defendant is unlikely to be brought to trial in the United States absent his or her extradition.  See United States v. Fernandes, 618 F. Supp. 2d at 69.  Arrest, however, is also a necessary predicate that must be achieved if the ultimate constitutional obligation to bring the defendant to trial with due speed is to be fulfilled.  As a result, the United States may fulfil its obligation to act with reasonable diligence where it "actively pursued [Quintana] with reasonable diligence from his indictment to his arrest," even though it waited to diligently pursue extradition until Quintana was arrested.   Doggett, 505 U.S. at 656. Consequentially, despite that the United States delayed in seeking Quintana's extradition until the arrest, the United States' acted with reasonable diligence during the period between indictment and arrest, because Quintana had to be taken into custody before he could ever face the charges in his indictment in the United States.

In addition, the United States presents valid reasons for deciding not to seek Quintana's extradition before his arrest.  After United States v. Fernandes, the Honorable Timothy J. Kelly, United States District Judge for the District of Columbia, held that the United States may satisfy its constitutional obligation to provide a foreign defendant with a speedy trial even where it expressly decides not to seek extradition.  See United States v. Rodriguez, No. CR 19-224, 2023 WL 5740493 (D.D.C. Sept. 6, 2023)(Kelly, J.).  In United States v. Rodriguez, the United States did not request formally or informally Rodriguez' extradition from the Dominican Republic at

any time during the two-and-a-half years between Rodriguez' indictment and arrival in the United States.  See 2023 WL 5740493, *2-3.  Judge Kelly concluded, however, that the United States had "'prudentially refrained from initiating extradition proceedings' against Rodriguez . . . until the risk that its main investigatory target would flee had dissipated," United States v. Rodriguez, 2023 WL 5740493, at *6 (quoting the record), while it simultaneously "pursued Defendants' arrests with reasonable diligence," United States v. Rodriguez, 2023 WL 5740493, at *4.  Once Rodriguez' co-defendants had been apprehended and the risk that they would flee had subsided, the United States obtained "preliminary approval of Rodriguez's removal from the Dominican Republic" and, "[l]ess than three months later, it had tracked down the necessary documents and formally requested removal."  United States v. Rodriguez, 2023 WL 5740493, at *7.

The United States' actions here are similarly "reasonable."  United States v. Rodriguez, 2023 WL 5740493, at *7.  During the time between Quintana's indictment and arrest, the United States delayed pursuing Quintana's extradition, because he was concerned that seeking extradition would endanger the life of the witness who would be required to provide a sworn statement on a PAR.  See FOF ¶ 55, at 10.[16]  Additionally, Acee testified that diplomatic requests for Quintana's extradition may have resulted in Quintana's fleeing or going into hiding, because  there was substantial corruption within the Chihuahuan government.  See FOF ¶ 50, at 9.  While these arguments are insufficient to establish that an extradition request during this period would have been futile, see Section II(A)(1), supra at 48-49 n.13, the Court credits the

---

[16]In the Motion, Quintana indicates that the PAR precipitated Quintana's arrest.  See Motion at 1 ("Mr. Quintana was arrested pursuant to an extradition request by the United States submitted that same month.").  The record establishes, however, that the United States made the PAR shortly after Quintana was taken into custody.  See FOF ¶¶ 58-59, at 11.

fact that the United States was concerned about its investigation's integrity and the safety of those involved in the investigation as valid reason to delay seeking Quintana's extradition, see United States v. Rodriguez, 2023 WL 5740493, at *7 ("The desire to protect the integrity of its investigation . . . a 'valid reason' for some delay." (quoting Barker, 407 U.S. at 531)).  As in Rodriguez, once these concerns had sufficiently dissipated and Quintana had been apprehended, the United States immediately sought Quintana's extradition.  See United States v. Rodriguez, 2023 WL 5740493, at *7.       Doggett, 505 U.S. at 656.  Because the United States sought Quintana's arrest with reasonable diligence, and because extradition is not required for the United States to act with reasonable diligence and the United States provides valid reasons for delaying its request for extradition, the Court concludes that the period of delay between indictment and arrest does not weigh in favor of a constitutional violation.

2.     **The Period of Delay Between Quintana's Arrest and the Conclusion of the Mexican Proceedings against Quintana Does Not Weigh in Favor of a Constitutional Violation, Because the Delay was Caused by Mexico and the United States Formally Requested Quintana's Extradition.**

The delay between Quintana's arrest and the culmination of the Mexican proceedings against Quintana totals thirty-three-and-a-half-months.  During this period, Quintana faced criminal charges and was incarcerated in Mexico.  See FOF ¶ 62, at 11.  Courts largely have concluded that delays attributable to a defendant's incarceration in a foreign country do not favor a finding of a constitutional violation.  See, e.g., United States v. Valencia-Quintana, 136 F. App'x at 709 (reasoning that "the first seven years of the delay[, which] resulted from Valencia's arrest and incarceration in the Dominican Republic," could not be "attributable to a lack of diligence on the part of the government"); United States v. Reumayr, 530 F. Supp. 2d at 1204 (concluding that a "six-and-one-half-year period . . . consumed by various decisions by Canadian

courts and authorities" did not weigh against the United States).  At the same time, courts have held that "even in cases where the defendant is imprisoned in a foreign treaty country which might elect to defer extradition, the failure to seek extradition is delay which is attributable to the government."  United States v. McDonald, 172 F. Supp. 2d  at 948.

During  the  time  Quintana  faced  charges  in  Mexico,  the  United  States  had  already officially requested Quintana's extradition.  See FOF ¶ 60, at 11.  Compare United States v. McConahy, 505 F.2d 770, 773 (7th Cir. 1974)(holding that in the absence of an attempt to seek extradition  of  the  defendant,  who  was  incarcerated  in  Britain,  the  delay  in  his  trial  was attributable  to  the  government).   By  officially  requesting  Quintana's  extradition,  the  United States  did  more  to  bring  Quintana  to  trial  than  it  did  in  United States v. Valencia-Quintana, where the United States Court of Appeals for the Third Circuit held that a delay during which the defendant faced charges in the Dominican Republic could not weigh against the United States, where the United States "inquired into Valencia's status every six to nine months, but no formal extradition request was ever filed."  136 F. App'x at 708-09.  The Court concludes, therefore, that this period of delay does not weigh against the United States.  Likewise, this delay cannot weigh  against  Quintana  where  there  is  no  evidence  that  he  remained  in  Mexican  custody, because he was actively fighting extradition.  See United States v. Alexander, 817 F.3d 1178, 1181 (9th Cir. 2016)(affirming the district court's attribution of blame to the defendant for the sixteen months he spent fighting extradition to the United States while in Canadian custody).  The  thirty-three-and-a-half-months  during  which  Quintana  spent  in  Mexican  custody  while facing  charges  brought  against  him  is,  therefore,  attributable  to  Mexico  and  not  either  to  the United States or to Quintana, and does not weigh in favor of a constitutional violation.  Cf. United States v. Alexander, 817 F.3d 1178 (concluding that "32.5 months of the delay," during

which Canada held the defendant in custody and delayed the United States' extradition request, "was attributable to Canada").

**3.     The Period of Delay Between the Conclusion of the Mexican Cases Against Quintana and Quintana's Extradition Does Not Weigh in Favor of a Constitutional Violation, Because the United States Acted with Reasonable Diligence.**

Seventeen-and-a-half-months elapsed between the culmination of the Mexican criminal proceedings against Quintana and Quintana's extradition. Quintana argues that the United States was negligent in bringing Quintana to trial during this period. See Supp. Motion at 7. During this period of delay, having already submitted a formal extradition request, see FOF ¶ 60, at 11, the United States made further efforts to bring Quintana to the United States, see FOF ¶ 66, at 12. At the same time, the United States continued its attempts to turn Quintana into an informant, and Quintana made a request to speak with the prosecution about assisting in the United States' investigation. See FOF ¶¶ 67-68, at 12. The United States did not deliberately delay Quintana's extradition in any way. See FOF ¶ 69, at 12. The Court concludes that the United States has shown that its ultimately successful efforts to have Quintana extradited demonstrate reasonable diligence during this period of delay.

Once a defendant is in custody in a foreign country with which the United States has a valid extradition treaty, the United States has an obligation to seek the defendant's extradition. See United States v. McConahy, 505 F.2d 770 (7th Cir. 1974)(holding that in the absence of an attempt to seek extradition of the defendant, who was incarcerated in Britain, the delay in his trial was attributable to the government). The United States satisfied its obligation to seek Quintana's extradition by formally requesting his extradition upon his arrest. See FOF ¶ 60, at 11. This case stands, therefore, in contrast to United States v. Pomeroy, where the United States

Court of Appeals for the Eighth Circuit faulted the United States for its failure to request extradition once the defendant had been apprehended in Canada.   See 822 F.2d at 721-22. Having made a "proper request" for Quintana's extradition, United States v. Pomeroy, 822 F.2d at 722, the United States further demonstrates its diligence by continuing to work to bring Quintana to the United States more quickly, see FOF ¶ 66, at 12.   Cf. United States v. Valencia-Quintana, 136 F. App'x at 710 (holding that a period of delay "cannot be attributed to negligence on the part of the government," even where the United States did not "file a formal request for extradition," because the United States worked to "secure[] an agreement with Dominican authorities by which [the defendant] would be expelled").   Finally, the period of delay is reasonable considering that coordinating a defendant's extradition from another country requires a certain amount of time, no matter how diligently the prosecution works to bring the defendant to the United States.   See United States v. El Naddaf, No. CR 13-10289-2-DPW, 2023 WL 2541555, at *18 (D. Mass. March 16, 2023)(Woodlock, J.)(recognizing that, in "[t]he circumstance of the indictment of a defendant residing outside the United States . . . , delays in bringing such a defendant to justice may occur almost as a matter of course"); United States v. Rodriguez, 2023 WL 5740493, at *7-8 (concluding that the United States acted with "reasonable diligence" where over nine months passed between the United States receipt of "preliminary approval of Rodriguez's removal from the Dominican Republic" and Rodriguez' extradition  and where some of the delay resulted from the "government arrang[ing] the removal operation internally and with a foreign government").   As the Court has found, ultimately it is the Mexican government that decided the timing of the extradition.   See FOF ¶ 70 at 12.   Accordingly, the Court concludes that the United States satisfied its constitutional duty to make a diligent, good-faith effort to bring the fugitive before the district court for trial.

4.     **The Period of Delay Between the Quintana's Extradition and Trial Does Not Weigh in Favor of a Constitutional Violation, Because the United States and Quintana Both Contributed to Equal Periods of Delay During this Timeframe.**

The delay between Quintana's extradition on August 18, 2022, and trial, which is scheduled for January 16, 2024, is sixteen-and-a-half months.  In Muhtorov, the Tenth Circuit held that a lengthy period of discovery did "not favor finding a constitutional violation," 20 F.4th at 647-48, because the defendant made "broad discovery requests," 20 F.4th at 644, and because "the district court's and the parties' obligations to comply with CIPA significantly complicated the discovery process," 20 F.4th at 644.  Likewise, here, Quintana has sought broad discovery, requested five continuances, and engaged in an extensive pretrial motion practice.  See Part III, infra at 66-67. The Tenth Circuit often has held that delays resulting from a defendant's requests to continue weigh against the defendant.  See United States v. Batie, 433 F.3d 1287, 1291 ("Roughly eight months, or nearly half, of the delay of which Mr. Batie complains was consumed by defendant's motions for continuances . . . ."); United States v. Benally, No. CIV 10-0052, 2010 WL 11619197, at *7 (D.N.M. December 28, 2010)(Molzen, M.J.)("The second Barker factor weighs heavily against defendant because legitimate defense preparation and scheduling needs were the basis for each of the five requests for delay of the first trial."), report and recommendation adopted sub nom. United States v. Nieto, No. CR 10-0052 JB, 2011 WL 13286153 (D.N.M. Jan. 5, 2011)(Browning, J.).  Accordingly, a certain portion of the delay between extradition and trial is attributable to Quintana.  See United States v. Casas, 425 F.3d 23, 34 (1st Cir. 2005)(concluding that the second Barker factor "weigh[s] against a finding of Sixth Amendment violation," because "delays were due in large part to the resolution of pre-trial matters concerning appellants and their co-defendants" and the defendant "filed nineteen pretrial

motions, including one to continue the trial").

As was also the case in Muhrotov, the parties have been "obligat[ed] to comply with CIPA." 20 F.4th at 644. The Court concludes, however, that delay resulting from the missed CIPA deadlines is attributable to the United States. The United States first indicated that it planned to proceed under CIPA on January 11, 2023. See United States' Response to Motion to Compel Production of Documents and Discovery or In the Alternative, Motion for a Pretrial Conference Pursuant to 18 U.S.C. App. 3 (CIPA) Section 2, or In the Alternative, Notice of Forthcoming CIPA Section 4 Motion at 7, filed January 11, 2023 (Doc. 316). After numerous delays and missed deadlines, the United States submitted its CIPA § 4 filing on November 20, 2023. See Government's Notice of Classified Filing at 1, filed November 20, 2023 (Doc. 394). In Muhtorov, by contrast, the Tenth Circuit acknowledged that "the government worked diligently and promptly . . . to use the CIPA process to comply with Mr. Muhtorov's broad discovery requests." 20 F.4th at 645-48. While the Court acknowledges that the CIPA "process take [sic] time," Muhtorov 20 F.4th at 645, the United States did not act "promptly" under the statute where it missed multiple Court-ordered discovery deadlines and acknowledged the lengthy nature of the process. See Draft Transcript of September 12, 2023, Hearing at 17:8-22 (taken September 12, 2023)(Castellano)("September Tr.")(acknowledging "the Court's frustration," but arguing that the United States had to wait for the approval of the stakeholder agencies before it could proceed with the CIPA process); November Tr. at 293:16-294:4 (Court, Castellano)(indicating that the declassification process remained ongoing).

Here, the delay resulting CIPA process is more akin to that in United States v. Gould, where the Tenth Circuit reversed in part the district court's determination that "Gould bore responsibility for 481 of the 764 days of delay between conviction and sentencing because he

had filed three motions for continuance."  672 F.3d at 937.  The Tenth Circuit reasoned that the district court committed clear error where it failed to attribute a 343-day delay, during which the defendant awaited the disclosure of a mental health report, to the United States, despite the defendant having "filed three motions for continuance" during this period.  672 F.3d at 937. Similarly, here, the Court will not fault Quintana for requesting continuances that were the necessary result of the United States' delay in providing discovery.  See, e.g., Joint Motion to Continue the September 19, 2023, Trial and Extension of Deadline Within Which to File Pretrial Motions, filed September 12, 2023 (Doc. 374)("The deadlines the Court set have expired but the defense is still awaiting the disclosure of evidence as it relates to the charged offense."). Accordingly, the Court concludes that the United States was "'negligent' . . . in the production of discovery" during the period between when it missed the Court's first deadline to comply with CIPA on June 15, 2023,[17] and it's CIPA § 4 filing on November 20, 2023.  Muhtorov, 20 F.4th at 640 (quoting United States v. Young, 657 F.3d 408, 415 (6th Cir. 2011)).  Consequentially, the Court "attribute[s] that period of delay toward finding a constitutional violation."  Muhtorov, 20 F.4th at 640.  See id. at 665 (Lucero, J., dissenting)("[T]he government is responsible for 'discovery logistics'" (no citation given for quotation).[18]  See United States v. Shulick, 994 F.3d

---

[17]At the May 18, 2023, hearing, the Court set a 28-day deadline for the United States to indicate which materials it would be able to declassify.  See  May Tr. at 26:24-27:7  (Court).

[18]The Court finds no intentional misconduct in the United States' actions.  Although the United States Attorney's office missed numerous deadlines to declassify discovery or to deliver its CIPA § 4 filing, the delay largely is attributable to other government agencies tasked with reviewing the material to determine whether it needed to remain classified.  See Draft Transcript of May 18, 2023, Hearing at 15:8-16:25 (taken May 18, 2023)(Court, Castellano)("May Tr.")(informing the Court that the United States was working with the FBI to declassify as much discovery as possible); United States' Response to Carlos Quintana's Motion to Dismiss Indictment or In the Alternative to Exclude Witnesses/Evidence for Failure to Disclose

123, 133 (3d Cir. 2021)("[I]t is well within the district courts' expertise to distinguish between one-off or lesser discovery violations and those committed chronically or in bad faith."), opinion amended and superseded on other grounds, 18 F.4th 91 (3d Cir. 2021).

In sum, the Court concludes that just over five months of the delay between extradition and trial -- resulting from the United States delay in the CIPA process -- is attributable to the United States.  As to the remaining eleven months of delay, a portion is attributable to Quintana as a result of his extensive pretrial practice, while a portion is necessarily attributable to "the ordinary demands of the judicial system and therefore not attributable to either party."  Williams v. Bartow, 481 F.3d 492, 505 n.6 (7th Cir. 2007).  On balance, therefore, the Court concludes that the United States and Quintana are deserving of equal blame for the period between extradition and trial, and this period of delay does not weigh in favor of a constitutional violation.

> **B.      IN WEIGHING THE PRETRIAL PERIODS, THE COURT CONCLUDES THAT THE SECOND BARKER WEIGHS AGAINST FINDING A CONSTITUTIONAL VIOLATION.**

Having "numerically assessed the reason-for-the-delay factor," the Court now proceeds to "determine[e] how heavily the delay weighs" by "assess[ing] the cause of the delay."  United

---

Discovery, filed August 14, 2023 (Doc. 363)("The prosecution has requested that the FBI review the materials and 'declassify' the materials if possible. The FBI is currently going through the review process to determine if they are able to do so." (no citation given for quotation)); United States v. Muhtorov, 20 F.4th at 645 ("[B]efore prosecutors file CIPA motions, they work with the intelligence community under Department of Justice procedures to identify materials responsive to a discovery request and, if possible, declassify the materials.").  Still, because the prosecution bears the ultimate burden of bringing the defendant to trial in a timely fashion, the period of delay during which the parties awaited the completion of the CIPA process is attributable to the United States.  See United States v. Batie, 433 F.3d at 1291 ("Nonetheless, the delays attributable to the government must be considered, even when they do not weigh heavily against the government.").

States v. Black, 830 F.3d at 1120 (quoting United States v. Gould, 672 F.3d at 937).  The degree by which a given period of delay weighs is assessed along a continuum:  A deliberate delay to "gain some tactical advantage" will weigh heavily against the United States, whereas less culpable explanations "such as negligence . . . should be weighted less heavily" but still favor dismissal of the indictment, because "the ultimate responsibility for such circumstances must rest with the government rather than with the defendant."  Barker, 407 U.S. at 531.  The United States has provided valid reasons for the delay in this case.  For first and third periods of delay, the United States acted neither intentionally nor negligently, because it acted with reasonable diligence to bring Quintana to trial, by pursuing first Quintana's apprehension and then extradition, thereby providing a valid reason for the delay.  The second period of delay was caused by Mexico as it pursued charges against Quintana.  Even so, the United States demonstrated its diligent pursuit of Quintana by requesting his formal extradition.  Finally, while the Court concludes that a portion of this period was caused by the United States' missed CIPA deadlines, given that Quintana was also responsible for an equal period of delay after his extradition, this period "does not tip this factor in favor of [Quintana]."  Muhtorov, 20 F.4th at 649.  Accordingly, the second Barker factor weighs against finding a constitutional violation.

### III.   THE ASSERTION-OF-THE-RIGHT FACTOR WEIGHS AGAINST A CONSTITUTIONAL VIOLATION.

"The defendant's assertion of his speedy trial right . . . is entitled to strong evidentiary weight in determining whether [he] is being deprived of the right," and, accordingly, a "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." Barker, 407 U.S. at 531-32.  "[T]he ultimate inquiry is 'whether the defendant's behavior during the course of litigation evinces a desire to go to trial with dispatch.'"  Muhtorov, 20 F.4th at 650

(quoting United States v. Batie, 433 F.3d at 1291).  "A defendant's early and persistent assertion of his right to a speedy trial will tip the third factor in his favor, but efforts to stall the proceedings, such as 'moving for many continuances,' will 'tip the balance of this factor heavily against the defendant.'"  United States v. Medina, 918 F.3d at 781 (quoting United States v. Margheim, 770 F.3d at 1328).  Because the Court concludes that Quintana has not "evince[d] a desire to go to trial with dispatch," United States v. Batie, 433 F.3d at 1291, the third Barker factor weighs against a finding of a constitutional violation.

Although Quintana does not provide any direct citations to the record, he argues that he asserted his right to a speedy trial "when he appeared before the Court for arraignment," and "when he filed and argued his notice of appeal of detention order."  Motion at 7-8.  The Court has reviewed the record of Quintana's arraignment and has found nothing to indicate Quintana's desire to proceed expeditiously to trial therein.  In addition, despite Quintana's representation to the contrary, Quintana made no formal demand for a speedy trial in Defendant Carlos Quintana's Appeal of Detention Order, filed February 22, 2023 (Doc. 326)("Appeal of Detention Order").  Instead, Quintana argued that "it has now been six months since Mr. Quintana's arraignment and five months since the deadline set by the magistrate judge for discovery, and Mr. Quintana has only a fraction of the government's discovery."  Appeal of Detention Order at 5.  Quintana argues further that his later objections to the slow pace of the United States' compliance with the discovery process count as assertions of his right to a speedy trial.  See Motion at 8.  In Muhtorov, however, the Tenth Circuit did not credit the same argument that "objecting to the slow pace of the government's discovery efforts throughout the proceedings" supported a finding that Muhtorov asserted his constitutional right to a speedy trial.  20 F.4th at 651; id. at n.78 ("Mr. Muhtorov offers no authority that his objections to the slow pace of discovery productions are

akin to the assertion of a speedy trial right.").  In addition, Quintana continues to object to the

slow pace of discovery in his four motions to continue trial, but does not assert his right to a

speedy trial.  See Joint Motion to Continue at 3, filed October 19, 2022 (Doc. 312)("First Motion

to Continue")("Mr. Quintana respectfully requests a continuance to complete several tasks that

are vital to the defense"); Joint Motion to Continue at 3, filed February 10, 2023 (Doc.

325)("Second Motion to Continue")("Defendant requests a continuance of the trial of no less

than 120 days from the current setting."); Defendant Carlos A. Quintana's Unopposed Motion to

Continue the June 21, 2023, Trial and Extension of Deadline Within Which to File Pretrial

Motions at 2, filed May 20, 2023 (Doc. 349)("Third Motion to Continue")("A proposed 90-day

continuance of the trial from the June 21, 2023, setting is necessary for defense counsel to

effectively represent the defendant . . . ."); Joint Motion to Continue the September 19, 2023,

Trial and Extension of Deadline Within Which to File Pretrial Motions, filed September 12, 2023

(Doc. 374)("Fourth Motion to Continue")(same).  Accordingly, the Court concludes that

Quintana did not assert his speedy trial right until he filed the Motion.[19]

Quintana's Motion, in which he firsts asserts his right to a speedy trial, comes on the "eve

of trial," thirteen months after Quintana's arraignment.  Muhtorov, 20 F.4th at 652 (citing United

States v. Banks, 761 F.3d 1163, 1183 (10th Cir. 2014)(weighing the third Barker factor against

the defendants where they "waited until trial to assert their right to a speedy trial" after

---

[19]The Court does not count Quintana's failure to assert his speedy trial right during the
time he was unaware of the indictment against Quintana.  See Doggett, 505 U.S. at 654
("Doggett is not to be taxed for invoking his speedy trial right only after his arrest.").

requesting continuances)).[20]   The thirteen-month delay between Quintana's arraignment and assertion of speedy trial right is closer to the amount of time that the Tenth Circuit has declared "weighs heavily against" a defendant, Black, 830 F.3d at 1120, than the period of time that the Tenth Circuit has adjudged a prompt assertion of the speedy-trial right.  Compare Muhtorov, 20 F.4th at 653 ("[A]n assertion five months in advance of a trial date is entitled to some weight . . . ."), United States v. Seltzer, 595 F.3d at 1179 (concluding that the third Barker factor weighed in favor of a defendant who first asserted his speedy-trial right about six months after his indictment), with United States v. Margheim, 770 F.3d at 1328 (concluding that the third Barker factor weighed against a defendant who filed a motion to dismiss nineteen months after the indictment, and noting that "it is difficult to overlook how late [the defendant's] motions to dismiss the indictment appear on the pretrial timeline").  See United States v. Bikundi, 926 F.3d 761, 780 (D.C.Cir. 2019)("[T]he fact that Florence did not assert her speedy trial rights until she filed a motion to dismiss sixteen months after her arraignment also weighs in the government's favor.").  Notably, in Black, the Tenth Circuit acknowledges that, even if the defendant had asserted his right to a speedy trial thirteen months after arraignment, the exact amount of time between Quintana's arraignment and Motion, the third Barker factor would still weigh against the defendant.  See 830 F.3d at 1121.  Accordingly, Quintana did not "promptly assert his speedy-trial right."  Black, 830 F.3d at 1120.

Finally, Quintana's conduct throughout the pretrial proceedings does not "evince[] a desire to go to trial with dispatch."  United States v. Batie, 433 F.3d at 1291.  Quintana moved for continuances on four separate occasions.  See First Motion to Continue at 1; Second Motion

---

[20]Quintana was arraigned on August 23, 2022, see Clerk's Minutes at 1, filed August 23, 2022 (Doc. 307), and filed his motion on September 19, 2023, see Motion at 1.

to Continue at 1; Third Motion to Continue at 1; Fourth Motion to Continue at 1; Muhtorov, 20 F.4th at 652 (reasoning that the fact that Muhtorov "did not request any continuances" did not undermine his speedy-trial right invocation); United States v. Dirden, 38 F.3d 1131, 1138 (10th Cir. 1994)(weighing the third Barker factor against a defendant who moved for a continuance).[21] In addition, Quintana changed his attorneys.  See Notice of Entry of Appearance and Substitution of Counsel, filed February 25, 2023 (Doc 329); United States v. Margheim, 770 F.3d at 1319 (concluding the defendant's "changing attorneys several times" tilted the third Barker factor against him).  Accordingly, because Quintana did not "promptly assert his speedy-trial right," Black, 830 F.3d at 1120, and because his behavior between arraignment and trial has not demonstrated a desire to proceed expeditiously to trial, see United States v. Batie, 433 F.3d at 1291, the third Barker factor weighs against Quintana.

### IV.   THE PREJUDICE FACTOR WEIGHS SLIGHTLY IN FAVOR OF A CONSTITUTIONAL VIOLATION.

The defendant "has the burden of showing prejudice," United States v. Nixon, 919 F.3d at 1273, and, despite that no single Barker factor "is a necessary or sufficient condition to the finding of the deprivation of the right of speedy trial[,] the lack of prejudice is nearly fatal to a claim."  United States v. Nixon, 919 F.3d at 1278.  If the United States causes more than six

---

[21]Quintana's Fourth Motion to Continue was undertaken partially in response to the slow process of discovery owing to the CIPA procedures.  See Fourth Motion to Continue at 2 ("The deadlines the Court set have expired but the defense is still awaiting the disclosure of evidence as it relates to the charged offense.").  This "highlights the 'awkward position' defense counsel often find themselves in" to "balance voluminous discovery and the responsibility to a client to make non-frivolous motions" with a desire for a speedy trial, Muhtorov, 20 F.4th at 652 n.80 (quoting Barker, 407 U.S. at 527)).  While the law is clear that moving for continuances tilts the third Barker factor against the defendant, see, e.g., Muhtorov, 20 F.4th at 652; United States v. Medina, 918 F.3d at 781, the Court considers the tension the Tenth Circuit identifies between the speedy trial analysis and counsel's need to prepare the best possible defense for his or her client in its overall consideration of how much weight should be attributed to the third Barker factor.

years of delay, the defendant establishes a presumption of prejudice.  See United States v. Seltzer, 595 F.3d at 1180 n.3 ("Generally, the court requires a delay of six years before allowing the delay itself to constitute prejudice.").  Otherwise, the defendant must provide "specific evidence of prejudice," Muhtorov, 20 F.4th at 653, by demonstrating oppressive pretrial incarceration, the defendant's anxiety and concern, or impairment to the defense, see Baker v. Wingo, 407 U.S. at 532.  Impairment to the defense, the most important interest," Jackson v. Ray, 390 F.3d at 1264, may result from lost witnesses and lost evidence, see Muhtorov, 20 F.4th at 654 (citing Barker, 407 U.S. at 532).

As an initial matter, because the United States has demonstrated that it acted with reasonable diligence -- and the Court has, therefore, concluded that no period of delay in this case is attributable to the United States -- Quintana must demonstrate with specificity how his defense was prejudiced.  See Muhtorov, 20 F.4th at 655 (recognizing that a presumption of prejudice is established only where the United States causes six years of delay); United States v. Heshelman, 521 F. App'x at 506 ("Where the government acts with reasonable diligence in bringing a defendant to trial, 'a defendant who cannot demonstrate how his defense was prejudiced with specificity will not make out a speedy trial claim no matter how great the ensuing delay.'" (quoting United States v. Young, 657 F.3d 408, 418 (6th Cir. 2011))).  Quintana does not argue that oppressive pre-trial incarceration or suffering anxiety or concern has specifically prejudiced him, see Motion at 8-9, and the Court agrees that Quintana cannot demonstrate that these concerns caused specific prejudice.  First, the time Quintana has spent incarcerated awaiting trial on the charges that the United States brought -- a little over thirty-four months -- does not approach the amount of time the Tenth Circuit has concluded weighs in favor of a finding of specific prejudice.  See Muhtorov, 20 F.4th at 656 ("[T]he mere fact of his

incarceration for six-and-a-half years weighs in favor of finding prejudice."). Nor has Quintana demonstrated that the "nature" of his pre-trial incarceration has been particularly "oppressive." Muhtorov, 20 F.4th at 656. See id. (concluding that the "animus [Muhtorov] experienced due to his religion" while incarcerated, and the fact that Muhtorov was incarcerated in "county penal facilities" as opposed to federal facilities, supported Muhtorov's argument that he had been specifically prejudiced). Second, Quintana has offered no evidence that anxiety or concern he has experienced "distinguishes his case from that of any other arrestee awaiting trial." United States v. Dirden, 38 F.3d at 1138.

Quintana's primary argument is that he has been prejudiced specifically, because by the delay in his being brought to trial has impaired his defense. Quintana represents that a key alibi witness -- a bishop who would be able to testify that, on the day Quintana is alleged to have delivered the load of marijuana to Gomez Farias, Quintana was at a public celebration in a nearby town -- died in September, 2021, see November Tr. at 217:19-23 (Knudsen); Motion at 9. In addition, Quintana contends that the loss of exculpatory evidence, such as photographs, police reports, and posters advertising the event he represents that he attended has specifically prejudiced him. See Motion at 9. The United States responds that Quintana's assertions of lost alibi witnesses are too speculative and that Quintana cannot demonstrate whether the evidence he was unable to secure would have been exculpatory. See Response at 8.

The Court concludes that, while Quintana has not demonstrated with sufficient specificity that the loss of alibi witness testimony has impaired his defense, he has demonstrated some prejudice through the lost physical evidence of the event. In evaluating whether the loss of evidence during a delay amounts to prejudice, the Tenth Circuit considers: "(1) the defendant's ability to demonstrate with specificity how the evidence would have aided his defense; (2)

whether the government's delay in bringing the defendant to trial caused the evidence to be actually lost; and (3) whether the defendant took appropriate steps to preserve the evidence." United States v. Medina, 918 F.3d at 781-82.  Regarding the allegedly lost witness, the Court concludes that Quintana has met the second requirement, because "[Quintana] could have used [the allegedly lost] testimony if his trial had proceeded in a timely manner" when the bishop was still alive, and the delay thereby caused the loss.  Jackson v. Ray, 390 F.3d at 1265-66 ("Mr. Brown died at least one and one-half years after the State entered the information against Mr. Jackson.").  The Court concludes, however, that Quintana's argument that the bishop's lost testimony specifically prejudiced him fails on the first and third prongs.

As to the first prong, the Court concludes that Quintana's argument of specific prejudice is too speculative, because Quintana has not "sufficiently identified the lost testimony," nor sufficiently established its materiality to his defense.  Muhtorov, 20 F.4th at 657.  First, unlike the situation in Muhtorov, where it was undisputed that the defendant's lost witness existed and was prepared imminently to travel to the United States for trial, Quintana has not provided any substantiation that the bishop existed nor that he would have been willing and able to attend trial even if trial had taken place at an earlier date.  See 20 F.4th at 655.  See United States v. Shulick, 994 F.3d at 135 (rejecting the defendant's argument of specific prejudice, because the defendant was unable to "substantiate" that the witness was rendered unavailable by illness).  Moreover, because Quintana offers no evidence that the bishop exists other than Knudsen's testimony that she spoke with witnesses who represented that Quintana "would have spoken" to the bishop at the celebration, November Tr. at  217:7-18 (Knudsen), Quintana has not dispelled the potential that he is "merely conjuring up potential witnesses," Jackson v. Ray, 390 F.3d at 1265.  See United States v. Vaughan, 643 F. App'x 726, 732 (10th Cir. 2016)(finding no specific prejudice

where the defendant "did not attach any supporting evidence . . . to support his allegation of prejudice").

Second, Quintana has not explained why other alibi witnesses cannot be located, even though he represents the celebration was "huge," November Tr. at 218:1-4 (Knudsen), and that he "spoke to numerous people at the celebration," November Tr. at 216:9-11 (Knudsen).  See United States v. Neal, 27 F.3d at 1043 ("[The defendant] has not adequately explained either why the facts to which the lost witnesses would have testified could not have been elicited from other witnesses.").  In addition, the bishop's testimony would be "cumulative" of testimony other witnesses can provide.  Muhtorov, 20 F.4th at 658.  Quintana has already identified two witnesses -- the same two witnesses that Knudsen alleges witnessed Quintana speaking to the bishop -- who can place Quintana at the celebration.  See November Tr. at 216:9-11 (Knudsen)("The witnesses I spoke to said that he was there . . . .").

In addition, as to the third prong, Quintana has not shown that he took any steps to preserve the bishop's testimony after he became aware of the indictment.  See United States v. Medina, 918 F.3d at 781-82.  In Jackson v. Ray, the Tenth Circuit excused the defendant from taking steps to preserve the testimony of a key alibi witness, "because [the defendant's] key witness, Mr. Brown, died before he knew about the pending information against him."  390 F.3d at 1264-65.  The Tenth Circuit contrasted the circumstance before it, in which the defendant "was not . . . on notice of the need to preserve testimony," with  situations in which "the accused knew of the pending indictment before the witness died but took no steps to preserve testimony." 390 F.3d at 1265.  Here, Quintana became aware of the indictment when he was arrested in May, 2018.  See FOF ¶ 56, at 10.  Despite that Quintana had counsel during the time after he was made aware of the indictment, see FOF ¶ 68, at 12, Quintana made no efforts to preserve the

bishop's testimony -- nor any other potential alibi witness -- before the bishop's alleged death three-and-a-half years later.  See United States v. Tranakos, 911 F.2d 1422, 1429 (10th Cir. 1990)(declining to find prejudice where the defendants knew of criminal charges before a key witness's death and took no steps to preserve witness's testimony); United States v. Neal, 27 F.3d 1035, 1043 (5th Cir. 1994)("Moreover, [the defendant] has not explained why neither he nor his attorney took steps to preserve the witnesses' testimony for trial.").  Consequentially, Quintana has not met his burden of explaining the steps that he took to preserve the testimony of those witnesses in attendance at the celebration that he represents which he attended nor why he was unable to take such steps.

The Court credits, however, Quintana's argument that the loss of physical evidence of the celebration specifically prejudiced him, although this conclusion is of little weight in the overall constitutional analysis.  First, the Court concludes that Quintana has demonstrated how this evidence would assist in his defense, because unlike the bishop's testimony placing Quintana at the celebration, a fact to which the two available witnesses could also testify, there is no similar substitute for the physical evidence establishing that the event took place.  Cf. United States v. Medina, 918 F.3d at ("Mr. Medina nonetheless cannot establish prejudice from the loss of the alleged alibi evidence on his phone because he has not shown that the evidence was unavailable from other sources.").  Knudsen testified that "much of the irrefutable evidence, such as photos, videos, church records, flyers, town records for the celebration of March 19 in Colonia Independencia are no longer available."  November Tr. at 219:17-21 (Knudsen).  Second, Quintana has established sufficiently that the delay in this case caused the physical evidence of the celebration to be lost.  See United States v. Medina, 918 F.3d at 781.  Knudsen testified, for example, that she "talk[ed] to witnesses who recalled having photos [of Quintana at the event]

but no longer have them," due to "the passage of time" and "because people no longer have [the phones the photographs were on." November Tr. at 219:11-16 (Knudsen). Cf. United States v. Vaughan, 643 F. App'x at 732-33 (concluding that the defendant could not demonstrate specific prejudice through loss of physical evidence where the defendant "did not present any evidence establishing that his brother's landscaping business ever had records showing he had worked the day of the Kansas robbery"). Third, Quintana can be excused for not taking steps to preserve this physical evidence at an earlier time, because, unlike the bishop's testimony, physical evidence of the event, such as flyers and photographs, would have been no more available in 2018 when Quintana learned about the indictment than they would be today. See State v. Redding, 274 Ga. 831, 833 (2002)(presuming that the defendant could not have preserved "an aerial photograph of the area had been given to the public defender's office and could not be found, and a scale model of the area had been destroyed . . . ."). Accordingly, the Court concludes that Quintana has established that the loss of physical evidence caused some prejudice to his case. The Court concludes, therefore, that the fourth Barker factor weighs slightly in favor of a constitutional violation.

After balancing all four Barker factors, the Court concludes that Quintana's Sixth Amendment right to a speedy trial has not been violated. In review, the Court concludes that: (i) the first Barker factor -- the length of the delay -- weighs in favor of a constitutional violation; (ii) the second factor -- reason for the delay -- weighs against a constitutional violation; (iii) the third factor -- the defendant's assertion of the speedy trial right -- weighs against a constitutional violation; and (iv) the fourth Barker factor -- weighs in favor of a constitutional violation, though not heavily. In balancing the Barker factors, the Court is mindful that "none of the four factors ... [is] either a necessary or sufficient condition to the finding of a deprivation of the right of

speedy trial." Barker, 407 U.S. at 533.

The Court finds Muhtorov instructive to the Court's balancing process.  In Muhtorov, the Tenth Circuit recognized that the first Barker factor weighed in favor of a constitutional violation, despite that the case was "complex," because it involved the CIPA process and a conspiracy charge.  Muhtorov, 20 F.4th at 659.  The same is true here.  Here, unlike in Muhtorov, the third Barker factor weighs against a finding of a constitutional violation, though it does not do so heavily.  See Muhtorov, 20 F.4th at 658; Section III, supra at 67 n.22.  The fourth Barker factor weighs slightly in favor of a constitutional violation.  See Muhtorov, 20 F.4th at 658.  Because the lost physical evidence is of limited import to Quintana's case, however, the Court concludes, as in Muhtorov, that the prejudice factor does not weigh heavily.  See Muhtorov, 20 F.4th at 657-58 (declining to not "weigh . . . prejudice heavily" where the lost testimony was arguably "cumulative" and "would not have gone to the 'gravamen' of the case" (quoting the record)).  At bottom, "[o]n the distinctive facts of this case," the Court concludes, as did the Tenth Circuit in Muhtorov, that "the second Barker factor tips the balance in favor of not finding a constitutional violation."  Muhtorov, 20 F.4th at 660.  The United States has provided "valid reason[s]," Barker, 407 U.S. at 533, for the delay in this case, notably that it sought diligently to bring Quintana to trial, see Doggett, 505 U.S. at 657.  Consequentially, because this case is much like Muhtorov, with the distinction of an additional factor weighing against finding a constitutional violation, the Court concludes that there was no violation of Quintana's speedy trial right.  See Muhtorov, 20 F.4th at 657-58; United States v. Corona-Verbera, 509 F.3d at 1116 (finding no constitutional violation despite an "eight-year delay between indictment and arrest" and a finding of prejudice, where "after extradition became more likely in 2002, the government obtained an arrest warrant and diligently sought extradition" from Mexico).

**IT IS ORDERED** that Defendant Carlos Arturo Quintana's Motion to Dismiss Based on Violations of His Constitutional Right to a Speedy Trial, filed September 19, 2023 (Doc. 377), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Alexander M.M. Uballez
  United States Attorney
Maria Y. Armijo
Randy M. Castellano
Ryan Ellison
  Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

     *Attorneys for the Plaintiff*

Erlinda O. Johnson
Adrian Gandara
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

     *Attorneys for Defendant Carlos Arturo Quintana*

Liane E. Kerr
Albuquerque, New Mexico

     *Attorneys for Defendant Jesus Isaac Rodriguez-Contreras*

Donald Kochersberger
Business Law Southwest LLC
Albuquerque, New Mexico

     *Attorneys for Defendant Claudio Rene Rojo-Nevarez*

Brian A. Pori
Albuquerque, New Mexico

*Attorneys for Defendant Ernesto Rodriguez*

Gregory M. Acton
Acton Law Office, PC
Albuquerque, New Mexico

*Attorneys for Defendant Guillermo Castillo-Rubio*